# BIG LAKE OIL CO. v. NATIONAL LABOR RELATIONS BOARD.

## No. 11059.

Circuit Court of Appeals, Fifth Circuit.

Jan. 29, 1945.

Robt. T. Neill, of San Angelo, Tex., for petitioner.

Alvin J. Rockwell, Gen. Counsel, National Labor Relations Board, and Malcolm F. Halliday and Guy Farmer, Associate Gen. Counsel, National Labor Relations Board, all of Washington, D. C., for respondent.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

This case comes to us on petition of the Big Lake Oil Company to review and set aside an order of the National Labor Relations Board pursuant to which the petitioner was ordered to cease and desist from certain unfair labor practices and to post appropriate notices. In its answer the Board requested that the order be enforced.

The order of the Board followed upon its finding that petitioner had, prior to the holding of an election to determine a collective bargaining representative, made written and oral statements to its employees which had interfered with, restrained, and coerced the employees in the exercise of rights guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, thereby violating Section 8(1) of the

Act, 29 U.S.C.A. § 158(1). The questions before us are:

1. Is the Board's finding of fact supported by substantial evidence?

2. Is the Board's order valid?

The facts pertinent to the determination of the issues are in the main uncontested and are as follows: In July of 1943, International Union of Operating Engineers, Local No. 709, affiliated with the A. F. of L., began a campaign to organize petitioner's employees, and a number of meetings were held. While these activities were going on, the vice president and general manager of petitioner wrote and posted upon petitioner's bulletin boards, and mailed to each employee, a letter addressed to the employees of the Big Lake Oil Company. This letter is set out in full in the marginal note.[1]

On July 27, 1943, the union filed with the Regional Board's Director a petition

[1] "To the Employees of Big Lake Oil Company:

"Representatives of the American Federation of Labor have given notice that a petition will be filed with the National Labor Relations Board for an election to determine whether a majority of the employees of Big Lake Oil Company desire to organize a union to engage in concerted activities for the purpose of collective bargaining with the Company.

"The Employees of Big Lake Oil Company have a right to form such an organization if they choose. The Company has no right to interfere with, restrain, or coerce any employee in the exercise of that right. It will not do so.

"Any election held will be by secret ballot. In the United States it is the duty of every citizen to vote. Do so. There will be no effort to interfere, and regardless of the result of the election no employee will get in bad with the Company because of any activity to carry the election or because of any argument he may advance. Whether an employee votes affirmatively or negatively, his standing will not be jeopardized. Of course no such activity should, nor necessarily will, interfere with the work for which the Company pays and to which it is entitled. The Company will make it possible to vote if necessary on Company time.

"The National Labor Relations Act does not compel an employee to assist in forming or to join a labor union. Under the law he is as free not to do so as he is to do so. If he does not join a union he has the right to deal individually with his employer.

"The Big Lake Oil Company has the right to express its views on this question. The employees are entitled to those views.

"In the judgment of the Big Lake Oil Company the organization sought to be effected would not prove to the interest of the employees or to their mutual interest.

"For the present and for some indefinite time in the future our united efforts and interest must be to assist in winning the War as soon as possible and in getting our boys back home. This is no time for experimenting. The Company takes this opportunity regardless of what the future may bring to state that its employees have done their part consistently, continuously and satisfactorily, and it offers its congratulations and appreciation.

"Old Number One—the discovery well—was brought in in May, 1923. Shortly thereafter the Company was organized. Some of you have been here since the organization. Some of you have sons and daughters born and raised on the lease that are old enough to have gone through college and some of the boys are now in the Army and Navy. We are holding their jobs for them.

"Without any union we have been able every year to pay a Christmas bonus. Sick benefits have been established. Hospitalization has been provided and is being maintained at a loss. The picture show is being run at a loss. We have our own golf course, tennis courts and swimming pool. We have established an annuity retirement plan. It became effective June 1st of this year. To accomplish this the Big Lake and the Plymouth Companies are paying more than five hundred thousand dollars back premiums for the employees' benefit. The Company contributes toward the payment of the premiums. Sons of the employees have been consistently aided in getting an education by giving them work in the summer—and they have done their work well. These are not the accomplishments of any union but the result of twenty years' cooperation between you and the Company.

"It is possible that there may be an attempt to construe the mere recital of these benefits as a threat that they might be withdrawn. This would be unfair. Such is not the intention. The Company cannot know any more than you can know what may happen if the projected organization is accomplished.

"The foregoing is submitted with the earnest hope that it will receive the careful and thoughtful consideration of each employee."

for investigation and certification of representatives. In the latter part of July or in the early part of August, the union held an open meeting which was attended by some 70 of petitioner's employees. W. J. Grissett, assistant superintendent of the company, attended this meeting under invitation of the acting president of the union. Following a speech by a union representative, Grissett asked whether it was permissible for him as well as others to ask questions, and permission being granted, asked whether there was any law which required the company "to give the men free $2500 insurance" or "to pay the men two weeks' Christmas bonus" or "to maintain a hospital and maintain a swimming pool, and things like that." Subsequently, and about a month before the election, Grissett stated that "if this union business come up * * *, that they might do away with the hospital, and bonus, and all"; that he didn't know for sure that this would be done, but "they could do that if it went over."

Two weeks before the election, Grissett told an employee that, though he (the employee) had always been independent, he might have to join the union later on, adding that he, Grissett, had a brother who at one time belonged to a union but who moved because the union put on a special assessment of so much money that he didn't like it.

When approached by an employee who asked about his prospects with the Company, Grissett told him that he could get somewhere if the matter was left up to Grissett, then added that if the union carried the election it would not be left in his hands; "it would be up to the union." To another employee Grissett stated that he had no regard as to which way the election went, but that the company, "had the privilege to fight" the union, and that "the company is going to fight it."

On October 13 and 14, petitioner's vice president wrote seven employees in the armed services at nearby camps, urging them to be present on October 22, to participate in the election set for that day; and, upon being telephoned by one of these employees that he had no means of transportation, petitioner sent its car to bring him a distance of about 85 miles.

Grissett of his own volition spent the day and part of the evening before the election contacting the employees, showing them how to mark a sample ballot which he had in his possession; and, following each interview, he checked the employee's name on the company pay roll.[2] He testified that he instructed petitioner's foreman "to see that everyone that was eligible to vote got away * * * some time during the day to vote, if possible, on the company time," adding, "my instructions were to see that everybody got an opportunity to vote; that it had been customary in State, county and school elections always to let the men come in, where possible, on company time, and to scatter them out as much as possible to avoid crowding at the polls."

The union lost the election by two votes. A week or so later Grissett told an employee, a member of the union, that "those

[2] With reference to this Grissett testified:

"Q. There has been some testimony with reference to showing some one a marked ballot, or not a marked ballot, but a ballot. A. I carried a sample ballot around the day before the election, yes, sir.

"Q. What did you do with it? A. I guess I showed that ballot to maybe 70 or 75 men. I am sure, during the day.

"Q. Publicly? A. Just wherever I happened to meet them, yes, sir.

"Q. What did you say with reference to it? A. I just asked them if they had seen the ballot, and asked them if they would like to look at it, and most of them did take it and look at it, and I told them if there were any questions they wanted to ask, to ask them and I would answer them.

* * * * * *

"Q. In doing that, did you go over the whole field, or travel over practically the whole field? A. Well, I was over the whole field. I didn't go south of the railroad tracks. I didn't get over there.

"Q. How much time did it take you to do that? A. It took me all day and an evening and part of the night, in spare time.

"Q. Was that the day before the election? A. Before the election, yes, sir.

"Q. Did you talk to any of the employees while you were going around there that didn't ask you anything about them? In other words, did you just put it up to them, and ask them something about the ballot? A. No, I just showed them the ballot and asked them if they wanted to ask me any questions, and if they didn't want to ask me any questions, I didn't answer them.

"Q. But you did contact them yourself? A. Oh, yes, I showed them the ballot."

leaders in the union had better watch their step," that the union was "not so smart after all," and that the petitioner "had the union full of spies all the time."

Upon these facts the Board found that petitioner had interfered with, restrained, and coerced its employees in violation of Section 8(1) of the Act.

■ We do not agree with the Board that the letter written by petitioner's vice president and general manager to its various employees was coercive. We think this letter was informative rather than coercive, and contained statements that the employer had a right to make. As said by this court in Jacksonville Paper Company v. National Labor Relations Board, 5 Cir., 137 F.2d 148, 152:

■ "The Act does not take away the employer's right to freedom of speech. The constitutional right of freedom of speech cannot be so abridged as to preclude an employer from expressing his views on labor policy or problems so long as such utterances do not, by reason of other circumstances, have a coercive effect on employees."

■ When, however, Grissett, by his questions in the open meeting, suggested that there was no law that required the company to provide insurance benefits, Christmas bonus, etc., which the company had previously provided, such questions were calculated to intimidate since they suggested that these benefits might be withdrawn. Grissett's other actions were likewise irregular and improper and revealed a persistent course to intimidate and coerce: his actions the day before the election in visiting the employees at work and showing them how to mark the ballot and, under the facts of this case, furnishing cars to carry employees to the polls, were outright interferences by the employer in a matter with respect to which the Act requires the employer to remain absolutely neutral. Knowing the company's opposition to the union, an employee could interpret Grissett's visit and instructions as to how to mark the ballot in but one way, namely, an unexpressed request that such employee vote against the union. Sending employees to the polls in a company car, while not always improper, in this case certainly suggested to the employees that the company expected them to react favorably to its views. Grissett's statements following the election that the leaders in the union had better watch their step and that the company had the union full of spies at all times, leave no doubt that the course pursued was intended to interfere with, restrain, and coerce employees.

■ ■ Petitioner also seeks to have us review the action of the Board in setting aside the election held on October 22, 1943. A review of these representation proceedings may not be had under Section 9(d) of the Act, 29 U.S.C.A. § 159(d), for the reason that no order based in whole or in part upon facts certified therein has been issued by the Board. Petitioner's suggestion of a diminution of the record and motion for a writ of certiorari to supplement the record to show the facts with respect to this issue is therefore overruled.

The petition to set aside the Board's order is denied, and the request of the Board for enforcement of its order is granted.

