**HENDRIX MANUFACTURING COMPANY, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 20125.

United States Court of Appeals Fifth Circuit.

July 24, 1963.

George E. Duncan, Wells, Duncan & Beard, Beaumont, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Jules H. Gordon, Atty., Stuart Rothman, Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., Washington, D. C., for respondent.

Before HUTCHESON, Circuit Judge, LUMBARD, Chief Judge,* and BROWN, Circuit Judge.

JOHN R. BROWN, Circuit Judge.

The Employer [1] petitions to set aside a cease and desist order of the Board based on violation of § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1) [2] and also its order issued in the consolidated proceeding requiring that a new election be held.[3]

---

* Of the Second Circuit, sitting by designation.

1. Hendrix Manufacturing Company, Inc.

2. Board case 15–CA–1977.

3. Board case 15–RC–2400.

The Board cross petitions for enforcement of the § 8(a) (1) order [4] and asserts a denial for want of jurisdiction as to the election order. We agree with the Board.

■ Faced with a number of adverse findings as to numerous incidents, the Employer has a formidable task in overturning an order in a factual case involving not a single new critical, legal issue. When this huge record and the lengthy briefs are boiled down, the Employer's attack takes two forms. The first, and one entirely consistent with our limited function, is a frontal attack on the fairness of the proceeding before the Trial Examiner. The second, which wholly misconceives our role, is a massive assault on the findings because the Examiner ought to have credited the Employer's version, not that of the Complainants.

■ Considering the vast power which the Board has and the ofttimes decisive consequence of fact findings made by it or the Examiner, we have long recognized that this hearing must be impartially conducted by an Examiner whose conduct as presider, in the management of the proceedings, must measure up to the fundamental essentials of a fair trial. Bias, hostility, injudicious conduct are therefore out. NLRB v. National Paper Co., 5 Cir., 1954, 216 F.2d 859, 866; NLRB v. Phelps, 5 Cir., 1943, 136 F.2d 562, 563–564; Sardis Luggage Co. v. NLRB, 5 Cir., 1956, 234 F.2d 190, 192; Inland Steel Co. v. NLRB, 7 Cir., 1940, 109 F.2d 9, 20.

■ But we find no substantial indication of any such bias in this record. In the final analysis, the Employer's attack comes down to a series of rulings which it regards as intrinsically erroneous. These included such things as an asserted unwillingness on the Examiner's part to hear further legal argument on a motion, disparate treatment of leading questions put by the General Counsel and Employer's counsel, limiting the scope of some cross examination, the nature of the Examiner's discussion as to credibility resolution of one of the Employer's key witnesses' testimony, and the like. If there were errors, they were simply that and nothing more. They certainly did not measure up to proof of a general attitude of bias, partiality or injudicious behavior.

This brings us to the merits. We see no need to recite the facts in detail as to the occurrences found to constitute violations of § 8(a) (1). They all grow out of the intense preelection campaign preceding the election of August 10, 1961, which the complaining union lost.

■■ As was its legal right, NLRB v. McGahey, 5 Cir., 1956, 233 F.2d 406, 409, the Employer made no bones about its opposition to the Union.[5] This lead off for top management was a preelection speech made by George Trippe, Secretary-Treasurer of Employer, delivered to the assembled employees. It was neither charged nor found that the speech, as such, was a violation of the Act. The Board, with ample justification did regard this as an emphatic statement of anti-union attitude. In this sense it is properly "background" against which to measure statements, conduct, and the like made by other management spokesmen, especially in terms of the interpretation which the employees reasonably could put

4. The order requires the Employer to
   "1. Cease and desist from :
   "(a) Interrogating employees in a manner constituting interference, restraint or coercion; instructing or soliciting employees to get other employees to vote against the Union; threatening employees with loss of their jobs, curtailment of benefits or other reprisals on account of their union activities; promising employees benefits to influence their vote in a Board election or their union sympathies or activities; or creating an impression among the employees that their union activities are under surveillance.
   "(b) In any other manner interfering with, restraining or coercing its employees in the exercise of their rights guaranteed in Section 7 of the Act."

5. Lodge 635, International Association of Machinists, AFL-CIO, and International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers.

on such actions. More specifically, this would bear on the question whether, from the listeners' point of view, these statements by subordinate management constituted forbidden coercion, threats, or intimidation.[6]

We may assume, as Employer asserts, that there is a good deal of basis for the impression that management was genuinely anxious that its anti-union attitude not manifest itself in an illegal way through subordinate management representatives. But in connection with an unfair labor practice charge (and not, for example, a post-decree contempt for "willful" violation by an employer itself), an employer is pretty generally bound by what its spokesmen do and say. When, as done here, an employer sets out to campaign against a union, one of the risks is that out of zeal, ignorance, or otherwise, foremen, supervisors, and similar representatives in championing the anti-union cause will overstep the mark. Since it is the policy of the Act to protect employees in a free choice of a bargaining representative, the law looks to what the listener-employees reasonably could have inferred from what was said and done by one authorized to engage in the anti-union preelection campaign. It is what he said or did, not what he was told to say, do, or not say or do, that counts.

The campaign included a follow-up to Trippe's speech. Supervisors Prothro, Lester, Hall, Stout, Wilson, and Edward Trippe, made the rounds of all of the employees (over 200) at their work. Several did and said things—or so others say they said or did—which, if credited, constitute clear violations under § 8(a) (1). For example, Prothro told employee Burlson that if the Union was elected, the employees would not get bonuses, paid holidays, etc. To another, he said that if the Union came in, the current profit sharing plan would be discontinued. To still another, he warned that union victory spelled a strict time clock punch-out with no more time off when work is finished earlier as existed under the present system. To others, he openly solicited their assistance to go around and encourage other employees to vote against the Union. Prothro was a vigorous campaigner. The evidence ties him in directly to at least 11 identified employees. In each conversation there were warnings sounded in pretty clear terms that bonuses, pensions, holiday pay, and the like would be out if the Union won.

There were similar incidents, some equally strong, some not so strong as to other supervisors. Supervisor Lester had several conversations with employees about the bonuses. These too were subject to construction by the listener as a plain warning that Union victory meant discontinuance. He also interrogated employee Sudds closely about Sudds' attending a Union meeting downtown. In Lester's mind Sudds was connected through another employee (Shelley) whose car (so Lester thought) was being used by the two of them. Before it was over, word got to both Sudds and Shelley that Lester was checking on their attending a Union meeting.[7]

6. We do not regard this as a left-handed finding that Trippe's statement was illegal. Cf. NLRB v. Colvert Dairy Products Co., 10 Cir., 1963, 317 F.2d 44.
   Of course the purpose of the speech, as was quite proper, was to state management's reasons why a union was not needed and why it hoped the employees would vote it down. It was, therefore, anti-union. But it was legally anti-union.

7. In the Report and the Order, this was phrased as "creating an impression" of surveillance. Seizing on this, the Employer asserts that under NLRB v. Walton Mfg. Corp., 5 Cir., 1961, 286 F.2d 16 (reversed 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829), we set aside an order based on creating an "impression" of surveillance. There is a great hazard that we get diverted by semantics. Here the Board could infer that there was certainly an *attempt* to make a surveillance. Preoccupation with whether it is an "attempt" or an "impression" conceals the real significance. Surveillance becomes illegal because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either

The Employer asserts that since some employees testified on cross examination that they were not "threatened" or the like, there is no proof of any such purpose even conceding that the conversations (or actions) took place. But this misses the whole point. Violations of § 8(a) (1) are not limited to threats made good. It is a question of whether, under the circumstances existing, the employees could reasonably conclude that the employer is threatening economic reprisals if they support the Union. NLRB v. Harbison-Fischer Mfg. Co., 5 Cir., 1962, 304 F.2d 738, 739; NLRB v. Griggs Equipment, Inc., 5 Cir., 1962, 307 F.2d 275, 276–278; NLRB v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381, 384. Here, of course, statements that bonuses, pension plans, and similar financial benefits would be cut off carried their own seeds of coercive threats. The only question is whether the words were spoken. It was for the Board to draw that conclusion from conflicting testimony. Once established as a verbal act, the discriminatory purpose was plain. NLRB v. Ferguson, 5 Cir., 1958, 257 F.2d 88, 90.

Here and there, of course, employees relented in part on cross examination so that effect of statements made by subordinate management representatives was merely a prophesy that if the Union came in, bargaining would start from scratch and all of the current employee benefits and advantages would be subject to new negotiations. But there was ample basis for the Board to conclude on the whole of the testimony—including much which was unequivocal on the point —that the various supervisors were sounding the discouraging warning that when the Union came in, these things would go out. That is enough.

On these incidents there was more than enough basis for the Board's finding of a § 8(a) (1) violation. This puts the Employer in an awkward spot since there is so much to knock out if it is to prevail here. Consequently, we need not determine, as such, whether the finding is supported that interrogation of a few employees by the company lawyer after the election also violated the Act. The violation was not interrogation as such. It was, rather, questioning these few as to his vote in the secret election. Just what may be done under these conditions ought to await a more substantial record.[8] Great latitude must, of course, be allowed an employer (and his counsel) in investigating or probably warding off threatened charges or complaints of unfair labor practices. Depending on the particular factual problems involved, this may reasonably require ascertaining whether a particular employee has signed a union authorization card or the like. See, e. g., NLRB v. Dan River Mills, Inc., 5 Cir., 1960, 274 F.2d 381, 388; cf. S. H. Kress & Co. v. NLRB, 9 Cir., 1963, 317 F.2d 225; NLRB v. Lindsey Newspapers, Inc., 5 Cir., 1963, 315 F.2d 709. We must say that under the circumstances of this record, we doubt that any one of the employees to whom the question was put felt that he was under either the slightest pressure to answer the question or that an answer, truthful or not, would have harmful consequence to him or his fellow employees. Cf. NLRB v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, 516; NLRB v. Dalton Brick & Tile

engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc.

8. As it is not necessary to base enforcement on this aspect, we need not determine specifically a subsidiary but related point. In connection with the post election interrogation by the company lawyer, the record indicates that the Examiner rejected either the tape recorder tapes or transcripts thereof when proffered by the Employer to establish just what words were spoken in these interviews. If this was based on the so-called general "policy" of the Board, it was errroneous. Admissibility, its purpose and form of this sort of evidence is not restricted by any such policy. Admissibility depends on all relevant factors under accepted principles of evidence. NLRB v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472, n. 32 and related text.

Corp., 5 Cir., 1962, 301 F.2d 886, 898. But we need not make a positive determination since it was not an act specified in the cease and desist order (see note 4, supra).

■ This leaves only the finding of a violation by reason of supervisors urging or requesting employees to go out and solicit anti-union votes from fellow employees. Nothing in NLRB v. Tennessee Coach Co., 6 Cir., 1951, 191 F.2d 546, 551, or Ore-Ida Potato Products, Inc., 123 NLRB 1037, support a right of an employer to get employees to become campaigners on its behalf. We make no hard and fast ruling and content ourselves merely with saying that in these circumstances it was a permissible element of the cease and desist order. As a part of the whole pattern and practice, the Board could find this to be an impermissible intrusion into the statutory free will of fellow employees in the selection of the bargaining agent.

■ Because there are so many types of activities concerning which the Board was warranted in drawing the inference that the actions were contrary to § 8(a) (1), we need not discuss other specific findings or the difference in treatment by the Examiner and the Board as to some of them. Credibility choices are not left to us. The cease and desist order, with some modification,[9] is therefore sustained.

■ Little need be said about the Employer's effort to have us review at this stage the order calling for a new election. It came from a consolidated proceeding and rests in great part on identical actions of the Employer. But ever since American Federation of Labor v. NLRB, 1940, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; NLRB v. International Brotherhood of Electrical Workers, 1940, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354, it has been clear that Courts of Appeals do not have the power to review representation proceedings. And jurisdiction does not come into being because the representation order arises out of a consolidated hearing as to which the Court of Appeals has jurisdiction to review the order concerning unfair labor practices. NLRB v. Falk Corp., 1940, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396. We have held this many times, e. g., Big Lake Oil Co. v. NLRB, 5 Cir., 1945, 146 F.2d 967, as have other Courts of Appeals.[10] Nothing in Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed. 2d 210, or similar cases[11] alters these principles.[12]

The petition to review the representation proceedings is dismissed for want of jurisdiction.

Order enforced.

Petition dismissed, in part, for want of jurisdiction.

---

9. The phrase "creating an impression" of "surveillance" is to be read in the light of our comments. Subparagraph (b) is to be modified by inserting the phrase "like or related" so that it reads "(b) In any other like or related manner interfering with * * *."

10. See NLRB v. LaSalle Steel Co., 7 Cir., 1949, 178 F.2d 829, 832, note 1, cert. denied, 339 U.S. 963, 70 S.Ct. 996, 94 L.Ed. 1372; NLRB v. Thompson Products, 6 Cir., 1947, 162 F.2d 287, 294, 298, 301; E. I. DuPont De Nemours & Co. v. NLRB, 4 Cir., 1940, 116 F.2d 388, 401, cert. denied, 313 U.S. 571, 61 S.Ct. 959, 85 L.Ed. 1529; NLRB v. J. L. Brandeis & Son, 8 Cir., 1944, 145 F.2d 556; Bonwit Teller, Inc. v. NLRB, 2 Cir., 1952, 197 F.2d 940, cert. denied, 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342.

11. The Employer urges also Greyhound Corp. v. Boire, S.D.Fla., 1962, 205 F. Supp. 686, affirmed 5 Cir., 1962, 309 F.2d 397, cert. granted, 372 U.S. 964, 83 S.Ct. 1090, 10 L.Ed.2d 128; Empresa Hondurena De Vapores, S.A. v. McLeod, 2 Cir., 1962, 300 F.2d 222, reversed, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547.

12. Acting under 28 U.S.C.A. § 1651, this Court earlier issued a restraining order prohibiting the holding of the new election pending final decision of this Court. This was done to preserve our jurisdiction to determine whether these recent cases brought about a change. Having determined on the merits that these cases do not expand our jurisdiction, the restraining order, issued for this limited purpose, is likewise dissolved.