CUSTOM RECOVERY, DIVISION OF
KEYSTONE RESOURCES, INC.,
Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

No. 77–2490.

United States Court of Appeals,
Fifth Circuit.

July 2, 1979.

John M. Capron, Erle Phillips, Atlanta, Ga., for petitioner cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John H. Ferguson, Peter Winkler, Attys., N. L. R. B., Washington, D. C., for respondent cross-petitioner.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

**TJOFLAT, Circuit Judge:**

This case is before us pursuant to sections 10(e) and 10(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(e), (f) (1976).[1] We are called upon by the employer-petitioner, Custom Recovery, Division of Keystone Resources, Inc. (the Company), to set aside a decision of the National Labor Relations Board (the Board), 230 NLRB 247 (1977), finding that the Company had violated section 8(a)(1) of the Act[2] by questioning an employee concerning his union activities and by threatening him with discharge should he continue solicitation on behalf of the union during working time. In addition, the Company seeks to have the Board's order of a second election set aside. Conversely, the Board cross-petitions for the enforcement of its orders. Since the Board's findings on the section 8(a)(1) violations are not supported by substantial evidence, we set aside the portions of the order involving the 8(a)(1) violations. However, we dismiss the appeal from the ordering of the new election due to our lack of jurisdiction.

## I. Facts

The Company is engaged in the business of recycling nonferrous metals in Greensboro, Georgia. During the time immediately preceding the events at issue here, the Company received shipments of scrap metal for reprocessing from its sole customer, Western Electric. In October 1975, the Company was advised that Western Electric planned to build its own recycling plant and phase out its use of the Company. By December 1975, there was a twenty-five percent reduction of scrap deliveries to the

---

1. These subsections grant us jurisdiction, respectively, to enforce, and modify or set aside orders of the National Labor Relations Board.

2. Section 8(a)(1), 29 U.S.C. § 158(a)(1) (1976) provides:

 It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [section 7] of this title.

Section 7, 29 U.S.C. § 157 (1976) provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

Company; accordingly, it reduced its work force through layoffs and began looking for other business.

Almost simultaneously a union organization campaign began at the Company. On January 8, 1976, the United Steelworkers of America, AFL–CIO–CLC (the Union) filed a petition for a representation election. A campaign ensued that included six anti-union speeches given by general manager Joseph Humphress to assembled workers, as well as active union solicitation by company employees. A January 27, 1976, Board representation hearing resulted in the issuance of a direction of election. The ordered election was held on March 19, 1976; the Company won, 37 to 33. The Union then filed objections to the election, which were consolidated with identical allegations of section 8(a)(1) violations made by the Regional Director for a hearing before an administrative law judge.[3]

■ The administrative law judge found that the Company had not illegally threatened the shutdown of the plant, the elimination of profit sharing and other fringe benefits, or the loss of work. 230 NLRB at 248–50, 252. He did find, however, that Humphress threatened employee Sidney Waller with discharge because of Waller's union solicitation during working hours. Applying the *Daylin* doctrine,[4] the administrative law judge ruled that the threatened discharge of Waller was a violation of section 8(a)(1) because the Company had no valid rule against solicitation and had not made an affirmative showing of impairment of production. *Id.* at 253. In addition, an unlawful interrogation was found to have occurred between foreman Richard Ellis and Waller, although no violation was found in conversations between four other Company supervisors and employees.

In consequence of these violations the Company was ordered, (1) to stop interrogating employees concerning their union activities, (2) to refrain from threatening employees with discharge unless they refrained from solicitation on behalf of the Union, and (3) to post notice of protected employee rights. In addition, the judge recommended a new election for a bargaining representative.

The Company filed exceptions to the decision, and the Board designated a three-member panel to review the proceeding. The Board affirmed the findings, conclusions and rulings of the administrative law judge and ordered a new election.[5] *Id.* at 247. The Company then petitioned this court for review, challenging the findings of unfair labor practices based upon (1) the threatened discharge of Waller under the no-solicitation rule and (2) the alleged interrogation of Waller. We now turn to these issues.

## II. *Threatened Discharge of Waller*

About a week after the representation hearing, Company general manager Humphress conducted a tour of the plant. Accompanied by production manager John Reese, Humphress stopped in Waller's work area. The Board's decision relates the following account of what ensued:[6]

3. The Union also filed an unfair labor practice charge against the Company contending that a January 26, 1977, permanent layoff of 24 employees amounted to discrimination made unlawful by section 8(a)(3), 29 U.S.C. § 158(a)(3) (1976). The Regional Director found these layoffs to have been justified by the Company's declining business. This issue neither was before the administrative judge nor is before this court.

4. *Daylin, Inc., Discount Division*, 198 NLRB 281 (1972), *enforced on other grounds*, 496 F.2d 484 (6th Cir. 1974). Under the *Daylin* doctrine, the discipline of an employee pursuant to an overbroad no-solicitation rule is unlawful un-

less the employer can establish the impairment of production.

5. However, Member Walther did not join in finding a violation for Humphress's threat to discharge Waller, because of the reasons set forth in Chairman Miller's dissenting opinion in *Daylin, Inc., Discount Division*, 198 NLRB 281 (1972), *enforced on other grounds*, 496 F.2d 484 (6th Cir. 1974). 230 NLRB at 247 n.2.

6. Noting the "considerable divergence" between Waller's account of the incident and that of Reese and Humphress, the Board assumed arguendo that the latter version was correct, apparently because in the Board's view the

Reese accompanied Humphress that day on a tour of the plant for safety reasons. Reese testified that before they left Waller's area, Humphress called over Waller and told him he had been informed by two other foremen and some employees that Waller was campaigning on company time and passing out cards. Waller did not respond and Humphress proceeded to tell him, "If I see anybody campaigning during working time or passing out cards during working time I am going to terminate them on the spot." Humphress told Waller that he did not care what they did on breaks and lunch because that was their own time. In his testimony, Humphress said people had reported to him that Waller was leaving his area and going over the plant attempting to talk to groups of people and get them to sign cards, and that this was within the first 10 days of February after the hearing before the Board. On that day he saw Waller, called him aside, and told him it had been reported that he had been campaigning for the Union and that this was strictly illegal during company time. During that time he should be working. He told Waller that during lunch hour or break time it was his own business, but during hours that he was supposed to be working they expected him to do just that. Finally, Humphress said he told Waller that anyone found campaigning for the Union during working time would be terminated on the spot. 230 NLRB at 253. From this testimony the Board concluded that the Company was guilty of a section 8(a)(1) violation because there was no evidence of the Company having previously promulgated or enforced any no-solicitation rule and Humphress's hearsay references to reports as to Waller's worktime solicitation were insufficient to show an actual impairment of production. This finding is based upon an application of the Board's *Daylin* doctrine.

 In its petition for review, the Company asks us to overturn the Board's

application of the *Daylin* doctrine to employer no-solicitation rules. The Board defends its *Daylin* doctrine as an appropriate allocation of the burden of proof pursuant to its duty and authority to balance employee organizational rights against employer property rights. We need not and do not rule on the propriety of the *Daylin* doctrine however. *Daylin* dealt with the *discharge* of employees for violating an overbroad no-solicitation rule. 198 NLRB at 285–86. There, the Board ruled that

> if an employee is discharged for soliciting in violation of an unlawful rule, the discharge also is unlawful unless the employer can establish that the solicitation interfered with the employees' own work or that of other employees, and that this rather than violation of the rule was the reason for the discharge.

*Id.* at 281. Here, no discharge has occurred. Humphress's warning to Waller enunciated the Company's position that union solicitation was not to take place during working time, although such solicitation could occur during an employee's non-working time. Such a rule is not incompatible with the appropriate balance between the employer's rights in maintaining production and the employees' organizational rights.

> "The Act, of course, *does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on working time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours.* Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. *It is therefore not within the province of an employer to*

---

Company had failed to fulfill the requirements of the *Daylin* doctrine in any event. We note, however, that the Board had found Waller

somewhat incredible in reviewing and rejecting two unlawful interrogation charges involving him.

*promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline."*

*Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945) (quoting *Peyton Packing Co.*, 49 NLRB 828, 843–44 (1943)) (emphasis added). This case does not present the situation requiring the Company to make an affirmative showing of impairment of production.[7] Thus, the Board's application of its *Daylin* doctrine in this case was unwarranted, and its finding of a section 8(a)(1) violation is not supported by substantial evidence.

### III. *The Alleged Interrogation*

The Board found that supervisor Ellis unlawfully interrogated Waller, relying upon the administrative law judge's credibility resolution favoring Waller's testimony over that of Ellis. According to Waller, about ten days before the election Ellis approached Waller at work and questioned him concerning union activities. Ellis, on the other hand, testified that he never had any conversation with Waller at the plant concerning the Union. Ellis did describe a conversation that occurred while riding to work with Waller, in which Waller brought up the Union in the context of the future of the plant.

■ Although this court generally gives great deference to the credibility resolutions of the finder of fact, *see NLRB v. Transway, Inc.*, 410 F.2d 368, 370 (5th Cir. 1969), when the theory of credibility is faulty, then the credibility resolution itself must fall. *NLRB v. Florida Citrus Canners Coop.*, 311 F.2d 541, 544 (5th Cir. 1963).

The administrative law judge credited Waller's version more than that of Ellis because of what he conceived to be an inconsistency in Ellis's testimony. A close examination of the testimony, however, reveals that the apparent inconsistency relied upon to discredit Ellis in actuality was not present. Although the administrative law judge found a contradiction between Ellis's testimony on direct and on cross as to whether Waller had asked Ellis what he thought would happen if the Union came in, the record reveals that he was testifying in different contexts on direct and on cross. On direct, Ellis was describing a conversation about the future of the plant in view of the plant's unreplaced loss of its only customer. In this discussion, he responded to Waller that he had no knowledge concerning the plant's closing, even if it unionized. Record, vol. I, at 220–22. On cross, the questioning focused upon the instructions Ellis had received during the union campaign concerning his right to express his opinion about the Union and its campaign claims. In this context, Ellis testified that Waller had never asked for his opinion as to the union campaign claims. *Id.* at 225–28. We see no conflict in this testimony. In fact, other testimony by Ellis on direct corroborates his response on cross. In answering a question whether he ever had a conversation at the plant with Waller concerning the Union, his reply was "None whatsoever." *Id.* at 222.

■ The administrative law judge found Waller credible because he "was impressed with his sincerity and manner and . . . [he] was consistent with his testimony." 230 NLRB at 251. This statement is somewhat incompatible with the judge's crediting testimony of other witnesses over that of Waller on three other occasions. *Id.* at 251–53. Moreover, his opinion expressly

---

7. The Board's findings also state, in an otherwise unexplained conclusion, that the Company's rule was "discriminatory since it did not apply to other forms of solicitation." 230 NLRB at 253. There is no other evidence referred to by the Board in its opinion, or brief and oral argument to this court, sufficient to

satisfy its burden of supporting its findings by substantial evidence. *Cf., e. g., William L. Bonnell Co. v. NLRB*, 405 F.2d 593, 595 (5th Cir. 1969) (evidence that solicitation for charitable purposes was routinely permitted supported finding of discriminatory application).

noted one instance in which Waller changed his testimony between direct and cross. Thus, the choice of Waller's testimony over Ellis's appears to be by default due to the perceived contradiction in Ellis's testimony. Since this contradiction did not exist, the Board was wrong in discrediting Ellis. From the record as a whole, the finding that Ellis unlawfully interrogated Waller is not supported by substantial evidence.

We have rejected both of the Board's grounds for finding violations under section 8(a)(1). Accordingly, we set aside so much of the Board's order as directed the Company to cease and desist from the specified practices and to post notices.

#### IV. *Order of Second Election*

The Company also requests that we vacate the Board's order to hold a second election. However, an order directing an election in a representation proceeding is not a final order directly reviewable by this court under sections 10(e) and (f) of the Act. *See Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1249 n.2 (5th Cir. 1978). As this court has held in a similar case:

> Little need be said about the Employer's effort to have us review at this stage the order calling for a new election. . . .
> Ever since *American Federation of Labor v. NLRB,* 1940, 308 U.S. 401, 60 S. Ct. 300, 84 L.Ed. 347; [additional citation omitted] it has been clear that Courts of Appeals do not have the power to review representation proceedings. And jurisdiction does not come into being because the representation order arises out of a consolidated hearing as to which the Court of Appeals has jurisdiction to review the order concerning unfair labor practices.

*Hendrix Manufacturing Co. v. NLRB,* 321 F.2d 100, 106 (5th Cir. 1963).

Accordingly, the petition to review the representation hearing order is dismissed.

PETITION FOR REVIEW GRANTED IN PART and DENIED IN PART.