NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ABRASIVE SALVAGE COMPANY, Inc.,
Respondent.

No. 13055.

United States Court of Appeals
Seventh Circuit.

Jan. 11, 1961.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner.

John E. Cassidy, Jr., Peoria, Ill., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

DUFFY, Circuit Judge.

This case is before us upon the petition of the Labor Board for enforcement of its order dated April 25, 1960, issued against respondent, following the usual proceedings under sec. 10 of the National Labor Relations Act, 29 U.S.C.A. § 160. The Board found respondent violated sec. 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), by discharging employee James Knowles for union activities; that it violated sec. 8(a) (1) of the Act by certain coercive acts towards its employees, and that it violated sec. 8(a) (5) of the Act by refusing to recognize and bargain with the union.

■ The issue before us is whether there is substantial evidence in the record as a whole to support the findings of the Board. The Act vests in the Board and not in courts of review the duty of appraising conflicting evidence and drawing inferences from established facts and circumstances. N. L. R. B. v. Taitel, 7 Cir., 261 F.2d 1, 3. To discover whether such substantial evidence did exist in the case at bar, it seems necessary to set forth in some detail the critical facts appearing in the record.

Respondent operated a small machine shop in Peoria, Illinois, having five employees during the period with which we are concerned. The business was established in 1946 to re-cut grinding wheels for Caterpillar Tractor Company. Its only regular customer was Caterpillar. Since its organization, Fred H. Kemp has owned the corporation, was and is its president, and usually was in charge of its operations. A nephew, James Kemp, was the foreman at the factory.

James Knowles, the discharged employee, had worked for the company since February, 1951. He was the oldest employee in point of continuous service. He had been a satisfactory employee. He had never been laid off during the entire period although others had been. In the summer of 1958, Caterpillar curtailed its production activities, and respondent found it necessary to lay off several employees. For a time, Knowles, Felder and Cooley were the only employees. Cooley was a young apprentice, recently married. To prevent Cooley from being laid off, Fred Kemp asked Knowles to share work with Cooley and teach him how to cut grinding wheels. Knowles became disgruntled at this request.

About January 10, 1959, Fred Kemp went to Florida for a vacation. He had made similar trips for nine or ten years previously. During his absence the business was under the direct supervision of his son, Hylee Kemp, who held the title of vice president of the company. Hylee was a college student who resided at his father's house. During the period Fred Kemp was in Florida, Hylee had frequent long distance telephone conferences with him.

There is testimony in the record that the employees of respondent became dissatisfied with Hylee Kemp's efforts to increase the rate at which they were required to operate their machines, and decided to seek information about joining a union. On Saturday, February 21, 1959, James Knowles communicated with his next door neighbor, James McGee, who was business representative of Lodge No. 360, International Association of Machinists, AFL–CIO (hereinafter called the union). The following Monday after work, all five non-supervisory employees of respondent attended a meeting in McGee's office which lasted from one to two hours.

At McGee's office, all of the employees signed cards at the top of which appeared "Authorization for Representation." The card authorized the union "to represent me for the purpose of Collective Bargaining * * * ." Nevertheless, employees Cart, Cooley and Scranton thought when they signed the cards they were doing nothing more than authorizing an election. These employees had expressed doubt about joining a union, but were willing to have a decision made by a secret ballot. Undoubtedly, McGee gave them some reason for their views. He testified, "I might have said that the election was the final—would be—as I

recall telling them the election, after all you're behind a curtain, and you do whatever you want to."

Within an hour after the meeting in McGee's office, Hylee Kemp made the first of two telephone calls to Fred Kemp in Florida. Kemp returned to Peoria the evening of the following day, February 24. He did not go to the plant on February 25, but spent the day at the Company's office located about two blocks from the plant. On the evening of February 25, after a meeting with Hylee Kemp and foreman James Kemp, president Kemp instructed foreman Kemp to discharge Knowles the first thing the following morning.

When Knowles arrived at the plant on February 26, foreman Kemp said to him, "no use bringing your dinner bucket in, you are fired." Knowles said, "he heard about this already?" and foreman Kemp replied, "yes, he heard about it; but * * * that ain't [the] reason we're firing you, we're firing you for cutting your machine down too slow."

Employees Felder, Scranton and Cooley arrived at the shop a few minutes later. Cooley asked foreman Kemp why Knowles had been fired. Kemp replied, "you guys know why," and ordered Cooley to either go to work or to get out with Mr. Knowles. Cooley then suggested to Felder and Scranton that as they had all joined together they should all stay together. However, Felder and Scranton said they could not afford to go out on strike.

A few minutes before Knowles was fired, foreman Kemp instructed Cart to go to president Kemp's office. When Cart arrived, president Kemp said, "I hear that you fellows want a union out there." Kemp then said, "well you know that I've told you if you want a union you can join it; I don't care." However, immediately thereafter Kemp told Cart if they had a union there would be a question as to Cart's seniority, that there was a chance Cart's wages might be frozen and that Cart would be classified as an apprentice. He also said that in union shops when a machine broke down, the operator of that machine would lose time while the machine was being repaired. He finally warned Cart that if things got too bad, he would move the plant to Florida because he had an offer on a building there. Cart returned to the shop and told Knowles and Cooley that he could not afford to go on a strike.

President Kemp then called Cooley on the telephone and said, "I don't know what you think you're doing, but * * * I don't think you know all you think you do; and there are two sides to every story." He asked Cooley to come to his office and when Cooley arrived, Kemp asked how many of the employees had signed union cards. Cooley replied they all had done so. Kemp told Cooley that under a union, he would not be classified as a machinist; that he would be assigned to a particular machine and if there was no work for that machine, he would be sent home. He also told Cooley that if the union came in and he could not afford to meet its terms, he would close the plant and move to Florida. He said he had an offer of a building in a town where they were crying for a machine shop.

■■ We hold there was substantial evidence in the record considered as a whole to support the Board's findings that respondent violated sec. 8(a) (1) of the Act by president Kemp's threats that if the union came in, the employees' wages might be frozen, that they would lose time during machine breakdowns, and that they would be classified as apprentices. Also, Kemp's interrogation of Cart and Cooley about union affairs was a violation of the same section. N. L. R. B. v. Wagner Iron Works, 7 Cir., 220 F. 2d 126, and Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613. The threat to move the shop to Florida was established by substantial evidence and was also a violation of sec. 8(a) (1) of the Act. N. L. R. B. v. Taitel, 7 Cir., 261 F.2d 1, 4.

■ We also hold there is substantial evidence in the record considered as a

whole to support the Board's findings that respondent violated sec. 8(a) (3) and (1) of the Act by discharging employee Knowles because of his union activities.

Before the Board and here, respondent advanced as the principal grounds for Knowles' discharge, the inclusion of defective parts in a shipment made to Caterpillar. The Board did not credit this reason principally because at the time president Kemp decided Knowles was to be discharged, he had no reason to believe Knowles had had any part in that particular shipment to Caterpillar.

Knowles undoubtedly was the leader in the union movement. He had worked for respondent for eight years without having ever been laid off. He was respondent's senior and highest paid employee. President Kemp admitted he was willing to give him a good recommendation elsewhere. President Kemp admitted to Cooley that he had learned of the meeting with union representative McGee the day before Knowles was discharged. The trial examiner and Board were warranted in rejecting president Kemp's testimony that he did not learn about the union activities until after the discharge of Knowles.

We do not think the record, considered as a whole, supports the Board's finding that respondent violated sec. 8 (a) (5) and (1) of the Act by refusing to bargain with the union.

It is clear from the record that a majority of the employees thought by signing the cards they were petitioning for a secret election. Some of them expressed reluctance to join the union. After the meeting between McGee and the five employees, McGee made no contact with respondent until after Knowles was discharged. McGee then telephoned Kemp and later wrote a letter to respondent. This was the only notice or proof of authorization which he submitted. On the same day, employee Felder called McGee on the telephone and told him he (McGee) had misinformed the men, and they wanted to withdraw their cards. A few days later, a written withdrawal was received by McGee.

The examiner and the Board found that respondent did not solicit its employees to withdraw from the union. We hold the employees had a right to withdraw as the union had not been certified or recognized as a bargaining agent, and there were no negotiations pending for a contract.

In N. L. R. B. v. Reeder Motor Co., 6 Cir., 202 F.2d 802, the employees signed union cards on March 1, 1950. On March 3, a union representative informed the company that the union represented a majority of its employees. On March 10, he left a specimen contract with the company. About March 14, the employees resigned from the union. On March 16, the union made a written request to respondent for a conference to negotiate. Respondent failed to recognize the union. In holding this was not an unfair labor practice, the court states at page 803, "The union had neither been certified nor recognized as a bargaining agent for respondent's employees and no negotiations for a contract were pending. The designation of a bargaining agent is not irrevocable (citing cases)."

This is not a situation where an employer refuses to bargain with the representative of his employees in order to obtain time to dissipate its majority. Furthermore, it is quite apparent that a majority of this small group of employees did not desire to have a union represent them. It would be a great waste of time and effort—probably accompanied with many irritations—to go through bargaining procedures with nothing to be gained by either side.

The Board's order will be enforced insofar as it requires respondent to cease and desist from the unfair labor practices found, and from, in any other manner, interfering with, restraining or coercing its employees in the exercise of their statutory rights. The order will also be enforced requiring respondent to offer reinstatement to employee Knowles and to make him whole for any loss of

pay he may have suffered by reason of the discrimination against him. The order will not be enforced insofar as it requires respondent to bargain with the union upon request. The notice which respondent is required to post should be modified accordingly.