**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MOORE DRY KILN COMPANY, Respondent.**

**No. 20007.**

United States Court of Appeals
Fifth Circuit.

July 3, 1963.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Robert G. Sewell, Atty., Stuart Rothman, Gen. Counsel, Allison W. Brown, Jr., Atty. N. L. R. B., Washington, D. C., for petitioner.

O. R. T. Bowden, Daniel R. Coffman, Jr., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before TUTTLE, Chief Judge, BELL, Circuit Judge and SIMPSON, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This petition to enforce an order of the National Labor Relations Board presents the usual questions of the requisite substantiality of supporting evidence as to violations found of §§ 8(a) (1), and 8(a) (3) and (1) of the Act,[1] and a further question, now frequently recurring, of whether a cease and desist order broader in scope than the class of the specific violations is warranted. Our jurisdiction rests on § 10(e) of the Act.[2]

Respondent is engaged in manufacturing kiln drying and handling equipment for the lumber and wood products industry. The matter in controversy arises out of the operation of the Jacksonville, Florida plant. The business of Respondent increased substantially beginning in the early part of 1959 with the result that fifty six additional workmen were employed during the period April-October 1959. The work force increased from a total of sixty six employees in March 1959 to one hundred twenty two employees by October 1959.

In December 1959 the company president advised the vice-president in charge of manufacturing, and the production manager that it might be necessary to lay off some employees in the future because the backlog of work was declining and new orders were tapering off. He based this forecast in part on the fact that there was a decline in the lumber and construction industry, company salesmen were finding it more difficult to get business, and some customers were requesting delayed shipments on their orders.

On January 8, 1960 the company announced a profit sharing incentive plan to replace a bonus plan on the basis that business in 1959 had been better than anticipated. Also the employees were given a general wage increase in early January 1960 following a general increase in January 1959.

An effort to organize the plant of Respondent was begun in early January

---

1. 29 U.S.C.A. § 158(a) (1) and (3).

2. 29 U.S.C.A. § 160(e).

1960, and on January 25 the union filed a petition with the Board for a representation election, seeking a bargaining unit composed of all production and maintenance employees. At about the same time five employees approached the production manager seeking his advice as to how to get union cards back that they had previously signed. Following this, the company sent a letter to all employees advising that they could write the Board and request that their cards be considered null and void. Cf. N. L. R. B. v. Overnite Transportation Co., 4 Cir., 1962, 308 F.2d 279. During this same period one or two employees prepared a withdrawal petition and circulated it among the employees. Forty two men signed the withdrawal petition asserting that they did not wish to be represented by a union, and that those petitioning who had signed union cards wished them to be considered void. Respondent was in no way connected with this petition.

On February 12, 1960, the company consented to having the union election on March 18 in the bargaining unit requested by the union. Respondent's president in the same month again discussed the possibility of a layoff of employees in view of declining business with the same company officials.

The election was held as scheduled and resulted in forty six votes for the union and forty five votes against the union. Two challenged ballots were ordered opened by the Board and both were "no" votes, thus changing the result of the election to a vote of forty seven to forty six in favor of the company.[3]

■ The company through its officials and supervisors conducted an intensive campaign against the union during the approximate two weeks period prior to the election and, without cataloguing the various acts of interference, restraint and coercion, it may be said without fear of contradiction that there is substantial evidence in the record as a whole to support the Board's finding that Respondent violated § 8(a) (1) of the Act. There was direct evidence of threats with regard to working conditions. For example, there was employee testimony that the president of Respondent stated that if the union came in he feared "a bunch of people was going to get hurt"; a vice-president said that the employees might lose all of the benefits they presently had; that the employees would have better jobs if they kept the union out; that there would be no more overtime, and in case of rain or the completion of an unloading job, the company would send the employees involved home instead of making work for them as had been the case. On another occasion a foreman was reported to have told one employee that if the union came in "it would take bread out of your mouth and your children's mouth". There were also thinly veiled promises of reward. The order as it regards the violation of § 8(a) (1) of the Act will be enforced.

■ The real issue presented centers around that part of the order which requires Respondent to reinstate nineteen employees laid off on April 8, 1960, and to make them whole for any loss of pay suffered. The Examiner found that the layoff was discriminatory and in violation of § 8(a) (3) and (1) of the Act. A careful consideration of the record convincingly demonstrates that there is no substantial evidence in the record when considered as a whole to support this finding. It was not necessary for Respondent to justify the layoffs until General Counsel carried its burden of making

3. The representation case and the unfair practices case were consolidated for hearing. The election was set aside but that question is not before us. It is not a final order reviewable under § 10 of the Act. 29 U.S.C.A. § 160. See American Federation of Labor v. National Labor Relations Board, 1940, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; Bonwit Teller, Inc. v. N. L. R. B., 2 Cir., 1952, 197 F.2d 640, Note 1, cert. den., 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342; and N. L. R. B. v. LaSalle Steel Co., 7 Cir., 1949, 178 F.2d 829, 832, Note 1, cert. den., 339 U.S. 963, 70 S.Ct. 996, 94 L.Ed. 1372.

out a prima facie case of discrimination. We stated the rule on burden of proof in Pratt & Whitney Aircraft Division, etc. v. N. L. R. B., 5 Cir., 1962, 310 F.2d 676, as follows:

" * * * the burden of proving discriminatory acts by the employer is and remains upon the General Counsel, and the employer need not justify action against an employee so long as it does not result from union activities. * * * But the burden of giving an adequate explanation for failure to rehire employees may be imposed upon the employer where the evidence gives rise to an inference of discrimination."

And see N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406.

█ Here the case of General Counsel rested in part on statements by employees and former employees that the business of Respondent was about the same throughout the period up to the time of the layoffs. Of course, this proved little as these employees had no access to the pertinent information that would form the basis of a management decision or judgment as to work force needed. General Counsel also could rely on the conduct of Respondent in violation of § 8(a) (1) of the Act, supra, as a background context out of which the layoffs occurred. With this background, and the fact that only three of the nineteen employees laid off had signed the petition against union representation, the Examiner could have drawn an inference that the layoffs were for the purpose of dissipating union strength where, under the facts, the election had been so close that each vote was important. This was sufficient to make out a prima facie case for General Counsel. Cf. Pratt & Whitney, supra; N. L. R. B. v. Duval Engineering & Contracting Co., 5 Cir., 1962, 311 F.2d 291; and N. L. R. B. v. Griggs Equipment Company, 5 Cir., 1962, 307 F.2d 275.

This inference however, is severely weakened by the fact that there was no evidence of knowledge of union activity on the part of Respondent as to seventeen out of nineteen of the employees. Moreover, the union leaders were not laid off; two of the laid off employees were recalled within a few days,[4] and one of these had not signed the petition. Thirteen of the nineteen were laid off in accordance with strict seniority, while the other six were retained because of greater ability. Of the six retained, only one had signed the anti-union petition. Moreover, of the two challenged "no" votes, one had not signed the petition.

The validity or sufficiency of the inference must also be tested in the light of the other evidence of record. . The president of Respondent testified with regard to the meeting in December 1959 where he forecast possible layoffs, the February meeting where he reiterated the possibility, and a March meeting where he instructed the production manager to prepare a layoff list on the basis of seniority except where work ability was an exceptional factor. The men on the list, save one hired in 1958, had all been hired during the business upturn in 1959. Each had been told at the time of hiring that the work was temporary. The greater ability of the men retained out of seniority was explained.

The testimony of the president that he based his forecast of the layoff on general business conditions known to him was uncontradicted. The general business conditions referred to were also uncontradicted. Evidence was submitted showing a declining backlog of work commencing in the latter part of the year 1959, which changed temporarily to an increase in the early part of 1960 but sharply decreased then beginning in March and continuing into July 1960, the month of the hearing. There was evidence to indicate more than the usual amount of work being done in manufacturing warehouse stock as distinguished from contract work up to the time of the layoff. Unlike the situation in Griggs,

---

4. These two are included in the group of nineteen by the Board for loss of pay purposes.

supra, the explanation of the layoffs stands under scrutiny.

Two of the employees laid off were re-hired in April. Their layoff was the result of a mistake in judgment of the production manager as they were needed in welding. Three additional employees quit between April and the time of the hearing and were not replaced. No over-time was necessary on the part of the remaining employees to carry the workload. Some few of the employees laid off were given temporary work during this period.

In sum, it is undisputed that the number of employees of Respondent had substantially increased in the last eight months of 1959 due to an increase in business. It is undisputed that management had a reasonable business basis for believing that its workload would decline in 1960. That it had good reason for so thinking is made the more evident by the uncontradicted proof that the seventeen employees in question who were not rehired were not needed, and that Respondent could also spare the services of the three additional workers who quit.[5]

The evidence sustaining the position of the General Counsel is weak indeed when viewed in this context. There was not a scintilla of direct evidence that the layoff was for anti-union purposes. Such inference as might have been drawn must give way to the substantial evidence to the contrary; or stated differently, it will suffice to say that we cannot conscientiously find that the evidence supporting the decision that these layoffs were discriminatory is substantial when viewed in the light that the record in its entirety furnishes. Universal Camera Corporation v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; and N. L. R. B. v. McGahey, supra, Cf. N. L. R. B. v. Atlanta Coca-Cola Bottling Company, 5 Cir., 1961, 293 F.2d 300, 309, re-hearing denied, 296 F.2d 896. The view of the Board does not rise to the level of a fairly conflicting view that should be sustained. N. L. R. B. v. Walton Mfg. Co., 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829. It follows that the petition to enforce the order as to the reinstatement will not be granted, and the order must be modified accordingly.

■ The last question presented is whether the scope of the order of the Board is too broad. The Board prepared no opinion, choosing instead to adopt the recommended order of the Trial Examiner. The Examiner stated that the unfair labor practices committed by Respondent were such as to indicate an attitude of opposition to the purposes of the act generally, and used cease and desist language inclusive of all rights guaranteed in § 7 of the Act. Respondent urges that it has had no past history of labor law violation, and that there is nothing in the record to indicate an attitude of opposition to the purposes of the Act generally on its part, citing Atlanta Coca-Cola Bottling Company, supra. See also May Department Stores v. N. L. R. B., 1945, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145. We have had recent occasion to pass on orders of this type. See N. L. R. B. v. Lindsay Newspapers, Inc., 5 Cir., 1963, 315 F.2d 709, and N. L. R. B. v. Boman Transportation, Inc., 5 Cir., 1963, 314 F.2d 497, where we refused to enforce and N. L. R. B. v. Galloway Mfg. Corp., 5 Cir., 1963, 312 F.2d 222, where we did enforce such an order. The propriety of the broad order depends upon the facts in each particular case. In view of the conduct of Respondent including the statement attributed to the company president that there would be no union, the veiled threats to the individual employees as to their future, the threat to do away with overtime and to

---

5. Shortly after the decision of the Examiner on April 7, 1961, Respondent moved to reopen the record for the purpose of submitting additional testimony, which was supported by the affidavit of Respondent's president, that twenty four additional employees had been laid off for economic reasons and that none of the seventeen had been rehired. The Board denied the motion to reopen on the grounds that such additional layoffs were immaterial, and could not affect the conclusion reached by the Board.

change other working conditions, we cannot say that the Board was not warranted in invoking this broad form of order on the basis of an attitude of opposition to the purposes of the Act generally.

The petition to enforce, as modified in all respects including the Order and Notice, to delete any requirement as to reinstatement and back pay will be granted.

Enforced in part; denied in part.