**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOUISIANA MANUFACTURING COMPANY, Respondent.**

**No. 18471.**

United States Court of Appeals
Eighth Circuit.
March 29, 1967.

Claricc R. Feldman, Atty., N.L.R.B., Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Warren M. Davison, Atty., N.L.R.B., Washington, D. C., were with her on the brief.

Paul S. Kuelthau, of Moller, Talent & Kuelthau, St. Louis, Mo., for respondent.

Before VAN OOSTERHOUT, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order, issued June 8, 1965 and reported at 152 NLRB 1301.[1] Respondent, Louisiana Manufacturing Company, is a corporation located in Louisiana, Missouri, and is engaged in the manufacture and distribution of alu-

---

[1] The Board's "Decision, Order, and Direction of a Second Election" found that respondent violated § 8(a) (1) of the Act (National Labor Relations Act) by soliciting abandonment of the Union and withdrawal of authorization cards, by promising benefits on refraining from activities in behalf of the Union and by interrogating employees concerning their own and other employees' union activities, by threats to move or close the plant, and that respondent violated § 8(a) (3) and (1) by the discriminatory refusal to reinstate employees Hardy Wilson and Richard J. Owens. Because of respondent's conduct prior to the election of April 21, 1964, that election was set aside and a second election ordered.

minum and plastic castings. There is no question of jurisdiction.

Beginning about the 1st of January, 1964, the United Mine Workers of America (Union) began an organizational drive of respondent's approximately 60 employees. On February 5, 1964, the Union filed a petition for election. After the filing of the election petition but prior to the election, the Union filed unfair labor practice charges against respondent, which charges were eventually dismissed by the Board. The representation election was held on April 21, 1964, and the Union lost. Thereafter, the charges[2] which are the subject matter of this litigation were filed with the Board and eventually submitted to hearing before a Trial Examiner.

Generally, the charges alleged that the Company interrogated, threatened, and made promises to employees; and that the Company refused to reinstate employee Hardy Wilson and discharged employee Richard Owens because of their union activities, all in violation of § 8(a) (1) and (3) of the National Labor Relations Act (29 U.S.C. § 158(a) (1) and (3)).[3]

The Trial Examiner found that respondent had unlawfully interrogated employees concerning their union activity and the union activity of fellow employees and had unlawfully promised benefits for refraining from union activity. The Trial Examiner did not believe, however, that respondent's speeches to the employees amounted to coercive threats. Rather, the Trial Examiner concluded that the statements "amounted to no more than statements of opinion or predictions, and fell within the protection of free speech under 8(c) of the Act."[4] The Trial Examiner found that employee Wilson was refused reinstatement because of his union activities, but that employee Owens was discharged because of insubordination to his supervisor, Charles Broz.

Both parties filed exceptions with the Board. The Board adopted the findings of the Trial Examiner with the exception that it found that the statements made to the employees were coercive in content and thus not protected by § 8 (c) and that employee Owens was a victim of harassment because of his union adherence, which harassment ultimately provoked Owens into an insubordinate act, thus giving respondent an ostensible reason for discharging him.

Consequently, the Board ordered respondent to cease and desist from tactics of interference, restraint and coercion, ordered employees Wilson and Owens reinstated and made whole, and ordered a second certification election.

## INTERROGATION, PROMISES AND THREATS

Dealing first with the interrogation of respondent's employees, it is

---

2. Four separate cases charging unfair labor practices were filed by the Board, along with amended charges allowed filed over the objection of the respondent. These cases were consolidated for hearing, which was conducted September 15–16, and December 1, 1964. The charge relating to Owens was filed October 12, 1964, after the hearing had commenced and testimony had been adduced by both sides on the earlier charges.

3. 29 U.S.C. § 158(a) (1) and (3) provides in part:
   "It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   * * * * *
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."
   Also charged was an 8(a) (4) violation which was not reached by the Trial Examiner.

4. 29 U.S.C. § 158(c) provides:
   "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

well established that the mere act of questioning employees concerning union membership is not unlawful in itself. Blue Flash Express, Inc., 109 NLRB 591 (1954); N.L.R.B. v. Trumbull Asphalt Company of Delaware, 327 F.2d 841 (8 Cir. 1964). However, when under all of the circumstances the interrogation coerces or interferes with employees in the exercise of their protected rights of self-organization, it is a violation of § 8(a) (1) of the Act. N.L.R.B. v. Ritchie Manufacturing Company, 354 F.2d 90 (8 Cir. 1965); N.L.R.B. v. Morrison Cafeteria Company of Little Rock, Inc., 311 F.2d 534 (8 Cir. 1963); N.L.R.B. v. Tennessee Coach Co., 191 F.2d 546 (6 Cir. 1951).

We believe the circumstances of this case fully warrant the Board's finding that the interrogation of respondent's employees violated § 8(a) (1) of the Act.

We note at the outset that this interrogation does not appear to serve any legitimate purpose. N.L.R.B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6 Cir. 1965), cert. denied 382 U.S. 830, 86 S. Ct. 69, 15 L.Ed.2d 74; Martin Sprocket & Gear Company, Inc. v. N.L.R.B., 329 F.2d 417 (5 Cir. 1964). Nor was the questioning an isolated example as in N.L.R.B. v. Johnnie's Poultry Co., 344 F.2d 617 (8 Cir. 1965). Superintendent of the Permanent Mold Division of the respondent Company, Charles Broz, is one of the primary actors in this drama. The record is replete with instances of his open hostility toward the Union, and the questioning of employees under his supervision was widespread, both as to incidents and individuals.

Employee Roy Wilson testified that Broz, on twelve or more occasions throughout the organizational drive, asked him if he knew which employees were supporting the Union. Employee Hardy Wilson testified that Broz asked his opinion of the Union and asked if Wilson knew the identity of the "ring-leaders". Broz also asked if Wilson knew which employees were taking and signing union cards and which employees were speak-

ing favorably of the Union. Broz then asked Wilson to find out who these employees were. On a later occasion, Broz asked Wilson if he had received a letter from the Union. Upon receiving an affirmative answer, the two men went to Wilson's home to allow Broz to read the letter. Broz then asked Wilson to bring him the letters he received from the Union and inform him of the employees who were supporting the Union. Finally, Broz asked Wilson on numerous occasions to write the Union, requesting a withdrawal card. When Wilson finally refused, Broz expressed his disgust with Wilson.

Employee James Lindsey was twice asked by Broz how he was going to vote and on the second occasion asked if he knew of anyone intending to vote for the Union. After the election, Broz asked Lindsey if he had voted for the Union and if he knew of any employees who had done so. Employees Charles Harrison and Roy Watson were both asked how they voted. Employee Richard Owens testified that Broz questioned him about his associations away from work. After some "hinting" and a few abusive suggestions, Owens admitted that he had been with some union organizers.

In the totality of these circumstances, we believe it was clearly demonstrated that Broz conducted a widespread, coercive, unjustified interrogation of employees regarding their union activities, the union activities of others, their voting records, their private correspondence, and their spare-time activities. This interrogation was undoubtedly calculated to, and no doubt did, have a significant intimidative effect on the organizational rights of the employees.

When a supervisor with expressed anti-union sentiments asks an employee about his union affiliation and the union sympathies of his fellow workers, there is going to be a most natural coercive effect on the questioned employee. N.L.R.B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (6 Cir. 1964); Martin Sprocket & Gear Company, Inc. v. N.L.

R.B., 329 F.2d 417 (5 Cir. 1964). Of course, any coercive effect can be occasionally neutralized by assurances that the questioning is not intended to interfere with the men's right to organize. See, Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754 (2 Cir. 1963). But no such assurances can be found in Broz's questioning.

This coercive effect is significantly reinforced when the employee is asked to single out fellow employees whom he discovers to be supporting the Union, and to report these activities to his employer. This employee may naturally assume that for an employer to go to such lengths, some punishment must be in store for union supporters. In addition, he probably assumes that other employees were approached as he was. Consequently, he will hesitate to make his union sentiments known to other employees, even in confidence, nor will he freely enter organizations of other employees for fear that one or more fellow employees will be following the wishes of their employer by spying upon and reporting his union activity. Thus, the questioning of employees about union activity of themselves and others and asking them to report union supporters, is very suspect and usually coercive in effect. Colson Corporation v. N.L.R.B., 347 F.2d 128, 142 (8 Cir. 1965), cert. denied 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157. In this situation the employer has, in effect, initiated a small-scale reign of terror in which the impression of an ubiquitous survillance must leave its mark on the freedom of action of the individual employees. Hendrix Manufacturing Company v. N.L.R.B., 321 F.2d 100 (5 Cir. 1963).

Equally offensive is the questioning of employees as to how they and their fellow employees voted in a certification election. The ballot is supposedly secret and the employer normally has no right to privately interrogate each employee as to how he or his fellow workers plan to vote or voted in a certification election. See, N.L.R.B. v. Pennwoven, Inc., 194 F.2d 521 (n. 1), (3 Cir. 1952); Wag-

ner-Wood Company, 148 NLRB 963, 1964 CCH NLRB § 13412. The usual connotation of a probing for this information is that those who "voted wrong" will be singled out for special treatment. This does not accord employees their statutory rights to freely organize without fear of reprisals or intimidation.

■ Furthermore, it appears that employee Hardy Wilson was promised rewards for his refusal to support the Union. Shortly after he secured the Union letter from Wilson, Broz stated that as long as Wilson would "help him" Wilson would always have a job. Wilson testified further that prior to and after the above incident, when Wilson was at least ostensibly anti-union, Broz promised him more money and better working opportunities. We believe the Board was justified in concluding that this was a promise of a reward for refraining from union activities and as such was an improper use of economic power to interfere with the organizational rights of the employees in violation of § 8(a) (1). N.L.R.B. v. William J. Burns International Detective Agency, Inc., 346 F.2d 897 (8 Cir. 1965); N.L.R.B. v. Chardon Telephone Company, 323 F.2d 563 (6 Cir. 1963).

■ Supervisor Broz and General Manager Clarence Brown made numerous statements to employees individually and in groups. The Trial Examiner thought that these statements were expressions of opinion and predictions protected by the free speech provision of § 8(c). The Board disagreed and found that the statements threatened employees with economic reprisals in violation of § 8(a) (1). We think the question on these statements is a very close one, but on the record as a whole we think there is substantial evidence to support the Board's finding of an 8(a) (1) violation.

Employee Watson testified that Broz informed him that "a union could close the foundry down, cause a lot of trouble." He testified further that General Manager Brown informed him that the Company had no intentions of signing a

contract with the Union and that a union would not do the men any good. He mentioned on two separate occasions that a neighboring company had been on strike so long that it was going to move out of town and that this could also happen to respondent if the Union were to win the election. Employee James Price stated that Brown addressed two shifts of employees at the foundry, informing them that he had never signed a contract with a union and he probably would not sign one now. Brown further stated that he would not sign any contract that required them to join a union and that there could be no wage increase in the near future.

Employee Wilson testified that Broz informed him that the Company could not afford to sign a contract, and striking employees would "starve to death." He said that it would do "no good" to vote for the Union. Broz also informed Wilson that if the Company had to pay higher wages there would be no miscellaneous work and employees would then have to be sent home when their machines broke down. Further, with a union contract the men could not be allowed time off to go deer hunting. This information Wilson was asked to "spread around."

Employee Robert Bone testified that he was told by Broz that unionization would cause a loss of his overtime work.

Employees Shannon, Lawson and Strange gave very similar testimony concerning a meeting of certain employees. They stated generally that General Manager Brown informed them that he would not sign a contract for higher wages, that if wages were increased the Company might have to close, and if the Union went on strike the striking workers would be out of a job.

Of course, it is an unfair labor practice for an employer to threaten employees with moving the plant and the loss of jobs as a result of their acceptance of a union. N.L.R.B. v. Byrds Manufacturing Corporation, 324 F.2d 329 (8 Cir. 1963); Reynolds Pallet &

Box Co. v. N.L.R.B., 324 F.2d 833 (6 Cir. 1963). Likewise, it is a violation of § 8(a) (1) to threaten employees with a loss of long-enjoyed privileges. N.L.R.B. v. Schill Steel Products, Inc., 340 F.2d 568 (5 Cir. 1965); N.L.R.B. v. American Pearl Button Co., 149 F.2d 311 (8 Cir. 1945). And, if an employer indicates that he does not intend to enter good faith negotiations with the union and as a consequence strikes with their attendant economic hardships are inevitable, this, too, may constitute proscribed coercive speech. See Board decisions cited in CCH Labor Law Reporter, § 3770.67.

Respondent contends, however, that its statements were not threats, but were only predictions and opinions that these things might come to pass; and it is true that most of respondent's statements were couched in terms of uncertainty which might be considered proper speech in many situations. But, the speech need not be viewed in a vacuum devoid of the circumstances in which it was uttered. These statements were made in the unstable period preceding a certification election. They were made in an atmosphere of undisguised anti-union animus and were accompanied by unlawful interrogation, surveillance, promise of reward, and requests to repudiate the Union. The speeches repeated the theme that economic ruin and the loss of long-enjoyed benefits would come to the employees if they accepted the Union. The question to be answered is whether under these circumstances the employees could reasonably conclude that the employer was threatening them with economic reprisals. Hendrix Manufacturing Company v. N.L.R.B., 321 F.2d 100, 105 (5 Cir. 1963). A reasonable guidance for review appears in Surprenant Manufacturing Company v. N.L.R.B., 341 F.2d 756, 760 (6 Cir. 1965):

"It is often difficult to determine whether certain statements by management constitute permissible forceful argument in support of management's opposition to the advent of a union (cases cited) or constitute an

illegal threat to the employees in the event the union should win the election. (Cases cited.) In such cases, if the inference or conclusion found by the Board that the statements constitute a threat is a reasonable one, which it was permissible for the Board to make, its conclusion will not be set aside on review, even though a different inference or conclusion ·may seem more plausible and reasonable to us."

▮ We believe the Board's conclusion that these speeches constituted threats is reasonable and permissible, that even though the language is in terms of predictions, the employees could reasonably infer that the employer was willing to use its economic power to see that its dire predictions came true.

All of these facts, the interrogation, inquiries as to employees' votes, promises of reward, surveillance, requests to withdraw union membership, and the coercive statements combine to give extremely solid support to the Board's finding of an 8(a) (1) violation. See, N.L.R.B. v. Elias Brothers Big Boy, Inc., 327 F.2d 421 (6 Cir. 1964); N.L.R.B. v. Abrasive Salvage Company, Inc., 285 F.2d 552 (7 Cir. 1961). This section of the Board's order is entitled to enforcement.

## REINSTATEMENT OF HARDY WILSON

Hardy Wilson was employed by respondent in 1961 and worked in the permanent mold department with Charles Broz as his supervisor. Apparently Wilson was a competent and skillful worker, and there is no record of his being involved in any misconduct. During the initial stages of the Union authorization drive in January 1964, Wilson gave every indication of opposition to the Union, during which time he was promised rewards and permanent employment. On February 13, 1964, Broz asked Wilson to withdraw the union authorization card that he had signed previously. The request was repeated several times and on February 18th or 19th Wilson stated that he would not vote for the Union but he did not want to make a withdrawal card. Broz retorted that Wilson was "two-faced". On February 24th, less than a week after this incident, Wilson entered the hospital for the removal of a kidney. Wilson was released from the hospital on or about April 1st, and shortly thereafter visited the plant. Broz told Wilson to hurry back to work. A few days later, the respondent became aware that Wilson was supporting the Union and had given a statement to a Board agent concerning conversations with Broz. On April 15th, the Company distributed a letter to all of its employees that characterized Wilson as a "union pusher" and a "liar". On April 21st, Wilson attempted to enter the plant and Broz said that he could not do so because he was no longer on the payroll. No explanation was given Wilson. On May 1st, employee Roy Watson asked Broz when Wilson would be returning and Broz replied that he did not know whether he was "going to let" Wilson return because he was a "troublemaker". On May 9th, Wilson brought a letter to the plant from his doctor which stated that Wilson was able to do light work and in three or four weeks he could return to heavy work. Broz stated that there was no work for him. Wilson asked Broz if he could return in three or four weeks when he could perform his old job. Broz replied that he would have to discuss the matter with General Manager Brown and remarked, "You caused too much trouble around here." Wilson questioned Broz about what he meant by "trouble" and Broz would not explain. On May 29th, Wilson again contacted Broz said that he had his doctor's letter allowing him to resume heavy work, to which Broz responded that he didn't give a "damn about the letter" and stated that Wilson would never be rehired because he caused "too much trouble."

Respondent does not now contend that Wilson was a "troublemaker" but argues that Broz did not consider Wilson to be physically capable of performing his job. This explanation and attempted justifi-

cations of its action seem somewhat ludicrous in the light of Broz's initial and repeated assertions that Wilson was not being rehired because he was a "troublemaker", and it borders on the incredulous to argue that Broz believed his estimation of Wilson's physical fitness was superior to that of Wilson's doctor. In fact, respondent's present explanation of Wilson's discharge gives every indication of being a hastily conceived afterthought designed to justify otherwise indefensible discriminatory activity. Under these circumstances, the Board was fully justified in refusing to accept respondent's explanation. N.L.R.B. v. Texas Bolt Company, 313 F.2d 761, 763 (5 Cir. 1963).

The facts indicate that when respondent became fully aware of Wilson's union sentiments he was vehemently denounced as "two-faced," a "union pusher" and a "liar". The close relationship and warm assurance that Wilson received as an ostensibly anti-union employee abruptly ended. There were no more promises of permanent employment and increased opportunities. Though only a few days earlier he had been told to hurry back, when he reported for work he was abruptly told there was no work for him. Wilson was immediately and repeatedly branded as a "troublemaker", even though he had no record of any disciplinary problems. When pressed for an explanation as to what was meant by "trouble", respondent was unable or unwilling to respond. From all indications, in the Company vernacular a union was apparently "trouble" and anyone who supported a union was consequently a "troublemaker".

, Though some conflict appears, there is strong evidence indicating that there was work available when Wilson first applied for reinstatement on May 9, 1964. The evidence indicates that respondent was a week behind on its schedules and was constantly seeking experienced and skilled labor, though its work was slowing down. Further, it appears that employee James Lindsey, who, incidentally, indicated his lack of support for the Union, was hospitalized and absent from work for two months. When he returned, he was assigned to do light work until he had recovered to the point that he was able to assume his old position. This indicates respondent's general need for experienced employees, that Broz had reinstated other workers who had serious illnesses, and consequently this indicated that Wilson was given special treatment.

All of these facts, Wilson's proven ability and clean record, the abrupt change in respondent's attitude toward him, the repeated statement that Wilson was a "troublemaker", respondent's refusal to explain its position to Wilson, respondent's inability in the N.L.R.B. proceeding to offer a satisfactory explanation of its conduct, and the apparent disparate treatment given Wilson, all tend to indicate and strongly support the finding of the Board that Wilson was discriminatorily denied reinstatement in violation of § 8(a) (3) and (1) of the Act. N.L.R.B. v. Melrose Processing Co., 351 F.2d 693 (8 Cir. 1965). This evidence, indeed, is "substantial evidence" justifying enforcement of this portion of the Board's order.

## DISCHARGE OF RICHARD OWENS

Respondent raises the procedural point that the Board and consequently this Court has no jurisdiction to decide the issue of Owens' discharge. The reason given is that the original charge filed with the Board indicated that Owens had been discharged because of testimony given by him in a Board hearing, a violation of § 8(a) (4) of the Act. The complaint issued by the Board charged that Owens had been discriminatorily discharged but that the discharge violated § 8(a) (3). This is obviously a technical and formal objection which we believe lacks substantial merit.

Of course, there are limits to which the Board may expand the scope of the litigation outside of the allegations in the charge. However, technical wording of the charge is not required. The charge will normally be "sufficient if it informs the alleged violator of the

general nature of the violation charged against him and enable him to preserve the evidence relating to the matter." N.L.R.B. v. Raymond Pearson, Inc., 243 F.2d 456, 458 (5 Cir. 1957); N.L.R.B. v. Martin, 207 F.2d 655, 657 (9 Cir. 1953), cert. denied 347 U.S. 917, 74 S.Ct. 514, 98 L.Ed. 1072. And, as generally noted in N.L.R.B. v. Kohler Company, 220 F.2d 3, 6 (7 Cir. 1955): "It has been said repeatedly that the charge is not a pleading, being intended, rather, as an administrative step necessary to set the Board's investigatory process in motion. The charge should, therefore, be construed broadly so as to allow any specific allegations in the complaint that are of 'the same general nature.' N.L.R.B. v. G. W. Thomas Drayage & Rig Co., 9 Cir., 206 F.2d 857, 859–860; * * *." (Other citations omitted.)

The charge before us alleged that Owens had been discriminatorily discharged on September 21, 1964. This same factual allegation would seem to support both a complaint under § 8(a) (4) and the present litigation concerning § 8(a) (3). Respondent was placed on notice of the factual matter in dispute, and has not pleaded that it was surprised or prejudiced by the complaint. Consequently, we find that the complaint was properly based on the original charge. The Board and this Court have jurisdiction to rule on the merits.

Employee Richard Owens worked in the permanent mold department under supervisor Charles Broz and was apparently an efficient employee. On the afternoon of September 21, 1964, two work days after he had testified for the General Counsel at a Board-conducted hearing in this case, Owens was discharged by Broz. From Owens' own testimony, the facts leading up to his discharge appear to be as follows:

Late in the afternoon, Owens left his work station to get an aspirin for a toothache. When he returned, Broz looked disgusted and asked him where he had been. When Owens told him, Broz replied, "You are always complaining about something. When you get sick, you are supposed to go home." Owens replied that he "didn't get sick at home" and that he "wasn't going home because it was too close to quitting time." Broz answered that Owens wasn't "doing anything anyway," and "might as well go home." After Owens responded that he did as much as anyone else, Broz stated that no one was doing anything and that Owens "just as well go on home." Owens then asked if Broz was "crazy" and stated, "I ain't leaving. Here I am and there is the door. I ain't leaving. If you want me out of here, you have to fire me first." Broz said to Owens, "Well, there is probably nothing wrong with you anyway." To which Owens responded, "What in the * * * you thing you are, a doctor? I don't need you to tell me when I'm sick." At this point, Broz was apparently extremely angry and stated in forceful language that he was not going to allow Owens to get smart with him, and then discharged Owens. This lengthy colloquy took place at Owens' work station, in full view of his fellow employees.

The Board contends that this confrontation was precipitated by a well calculated "campaign of harassment" in an effort to dispose of Owens because of Owens' union activities. To support its position, the Board primarily relies upon an incident that took place approximately six months prior to his discharge. On this occasion, Owens left the plant during working hours to take his injured son to the doctor without first telling his superior. Upon his return the next day, he was informed that he had been laid off for two or three days because of his infraction of the Company rule prohibiting unexplained absences. The Board points out that another employee who had not arrived for work on two straight days was not disciplined. The Board also points out one or two occasions in which Broz made disparaging remarks when he discovered Owens away from his post. We do not believe this slim evidence indicates anything near a "campaign of harassment," and this in-

cident is too remote in time to be of any probative value.

Owens' action in leaving work unexcused was a violation of a Company rule, and there was no charge at that time that his layoff was unreasonable or motivated by anti-union sentiments. The fact that Owens was a known union supporter, that respondent was clearly anti-union, and that a different employee had not been laid off for an infraction of the rules might well be some evidence that this particular layoff was discriminatory. A. P. Green Fire Brick Company v. N.L.R.B., 326 F.2d 910 (8 Cir. 1964). However, this is very little evidence in support of a finding that this layoff was an element of a discriminatory discharge some six months later. The long lapse of time between the first incident and the altercation leading up to Owens' final discharge indicates to us that these were two separate and distinct incidents and not a "campaign".

Secondly, Broz's remarks about Owens' absence from his post were isolated and not entirely unjustified. For, in fact, Owens was absent from his post a great deal, and had been reprimanded for this practice long before his union affiliation became known. Furthermore, we believe the Board took a colored and a constrained view of the reasonableness of Broz's reprimands.

Any faint inferences that might be drawn from these facts that Owens was discriminatorily discharged, we believe disappear in the light of the argument that actually preceded the discharge. Fort Smith Broadcasting Company v. N L.R.B., 341 F.2d 874 (8 Cir. 1965).

Broz had a right, in fact, a duty to his employer, to oversee the employees under his charge and keep them operating efficiently at their posts. When they are absent from their posts, he is justified in determining the reason for the absence and applying discipline where he, in his discretion, deems it necessary. In the exercise of his supervisory duties, Broz sought to find the reason for Owens'

absence from his work station. Owens took offense at a minor reprimand and actually invited Broz to discharge him. Owens was openly abusive in his language and obviously insubordinate in his conduct. Under these circumstances, Broz was not required to accept this kind of response from any employee. He had no choice open to him but severe disciplinary action. We believe the evidence overwhelmingly supports respondent's argument that Owens was discharged on the spot solely because of his abuse of and insubordination to his supervisor.

In so holding, we agree with the finding of the Trial Examiner:

"Certainly if Broz had tolerated such open and hostile insubordination he would have been denied any effective authority over employees from then on. It is also clear to me that if Owens had gone home as requested, Broz would have done nothing more, and the incident would have been forgotten. * * *

"If I were to hold for the General Counsel here, I would have to hold that an employee who becomes active in a union compaign and who testifies in a hearing, thereby gains immunity from discharge even though he openly defies his employer when they attempt to exercise their managerial rights. Such is not the law."

The evidence and inferences that Owens was discharged because of his union activities are extremely weak and insubstantial. On the other hand, the evidence is clear and convincing that the argument and Owens' unjustified insubordination actually precipitated his discharge. N.L.R.B. v. Ace Comb Company, 342 F.2d 841, 847 (8 Cir. 1965). Accordingly, the Board's order requiring the reinstatement of Owens is not entitled to enforcement.

As set forth herein, enforcement of the Board's order is granted in all respects, except that part finding Owens to be discriminatorily discharged, which is denied.