NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SAUNDERS LEASING SYSTEM, INC.,
Respondent.

No. 73–1605.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1974.

Decided May 14, 1974.

Corinna Metcalf, National Labor Relations Board, Washington, D. C., for petitioner.

Edward R. Young, Memphis, Tenn., for respondent.

Before MEHAFFY, Chief Judge, and GIBSON and WEBSTER, Circuit Judges.

GIBSON, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued June 25, 1973, and reported at 204 NLRB No. 68, which directed the Respondent, Saunders Leasing System, Inc., to cease and desist from two unfair labor practices in violation of § 8(a)(1) of the National Labor Relations Act, and to post appropriate notices. The Board also ordered that a representation election held on January 21, 1972, which the United Cement, Lime & Gypsum International Union, AFL–CIO (the Union) lost by a vote of 11–9, be set aside and a new election held.[1] We enforce the Board's order concerning one unfair labor practice and deny enforcement of the other.

[1]. The setting aside of the January 21st election and the ordering of a new election is not a final order and, therefore, is not now before this court for review. The court lacks jurisdiction to directly review the Board's decisions on certification proceedings. N.L.R.B. v. William J. Burns Int'l Detective Agency, 346 F.2d 897, 899 (8th Cir. 1965); N.L.R.B. v. Moore Dry Kiln Company, 320 F.2d 30, 32 n. 3 (5th Cir. 1963).

The Respondent has 78 branches in approximately 17 states and is engaged in leasing and renting trucks and trailers for intrastate and interstate use. The Respondent's Foreman, Arkansas, branch (Company), the site of the unfair labor practice in this case, is located across the street from Arkansas Cement Corporation, which leases 98 tractors and 99 trailers from the Company and is the Foreman branch's principal account. The production, maintenance, and office workers at Arkansas Cement Corporation are represented by the Union.

An employee of the cement company contacted Paul H. Balliet, International Representative of the Union, during the beginning of December, 1971, and informed him that certain employees of the Company wanted to organize. An organizational campaign ensued, and a December 22, 1971, Union letter to the Company requested recognition. On December 27th, the Union filed a representation petition with the Board, which scheduled a secret ballot election on January 21, 1972.

During a two-week period prior to the January 21st election, Vice-President Milton Hauser, who headed the Company's industrial and labor relations' division, met with employees on five different occasions to discuss the Union's organizational attempt. Hauser read from a prepared statement at these informal meetings and answered questions from the employees. Hauser convened one of the five meetings approximately 24 hours prior to the January 21st election, and during this meeting one of the alleged unfair labor practices occurred. Clearly, the record shows that an employee, without any prompting from Company officials, asked Hauser a question concerning the continuation of benefits during negotiations with the Union, although no witness remembered the exact wording of that question. Hauser testified:

The question had to do with benefits, from the standpoint of, if a Union should come into the Foreman operation, "Would we keep our benefits, retain everything we have and go from there?" or something to that effect.

The following exchange occurred between Earvin Wright, a mechanic with the Company, and counsel for the Company:

The Witness [Wright]: Mr. Hauser said that benefits would be cut out if the Union goes in.

Q. (By Mr. McCray) [counsel for the Company]: Who asked that question concerning benefits?

A. I'm not sure.

Q. You stated that Mr. Shaver asked a question. What question did he ask?

A. He asked a question something about the benefits, but I'm not for sure what he said.

Q. Do you remember the exact words of Mr. Hauser's response?

A. No, but he did say that the union would—the benefits would be cut out.

Darrell Shaver, a mechanic, testified that Timmy Roden asked the question regarding benefits—something to the effect, "Would we retain everything we have?". Timmy Roden testified that he did not ask the question regarding benefits during negotiations.

The administrative law judge found: "[O]ne employee asked in connection with the question as to how collective bargaining works. 'Don't you start in negotiations with what we have got already and go from there?' (Testimony of employee Wright and Hauser)." Although the record is not entirely clear concerning the exact wording of the question, it is clear that an employee did ask a question regarding benefits pending collective bargaining proceedings. We think that the record does show that Hauser's response was that the employees would lose their benefits during

collective bargaining and that they would have "to start from scratch." [2]

The administrative law judge held that Hauser's statements concerning withdrawal of benefits during collective bargaining constituted an unfair labor practice. The record presents a difficult and close question concerning the evaluation of the testimony. We think, on this issue, however, that there is substantial evidence on the record as a whole to support the factual findings and that no error of law appears.[3]

The Board's position concerning statements of "bargaining from scratch" is best stated in Wagner Industrial Products, 170 NLRB 1413 (1968). In *Wagner*, the Board stated:

As the Board and the Courts have recognized in other cases, in the course of organizational campaigns, statements are sometimes made of a kind that may or may not be coercive, depending on the context in which they are uttered. "Bargaining from scratch" is such a statement. In order to derive the true import of these remarks, it is necessary to view the context in which they are made.

Wagner Industrial Products, 170 NLRB at 1413 (footnote omitted).[4]

In *Wagner*, the Company sent a letter to employees which allegedly contained a threat of economic reprisal. It read in part:

Employees voting in this kind of election sometimes mistakenly assume that a union victory is bound to mean higher wages and benefits. Nothing could be further from the truth. Under the law, an employer is not required even to continue in effect its existing benefits if a union wins. Bargaining starts from scratch. What wages and conditions will prevail thereafter depends on what the employer is willing to give. Our company most certainly will not agree, merely because there is a union, to raise our costs out of line with our

2. Hauser did not recall whether the words "to start from scratch" were employed; whereas, three employees testified that these exact words were said by Hauser. Three other employees testified that similar words were said. The administrative law judge held that Hauser left "the impression with the employees that all their existing benefits would be eliminated for purposes of bargaining and that what they ended up with would depend in large measure upon what the Union could induce the Respondent to restore."

3. On June 24, 1973, the Board adopted the administrative law judge's findings and conclusions, and its order is reported at 204 NLRB No. 68.

4. *Wagner* correctly interprets the legal test to be applied. *Compare e. g.*, N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696, 702–703 (8th Cir. 1967) (see text); Surprenant Manufacturing Company v. N.L.R.B., 341 F.2d 756, 760 (6th Cir. 1965) (the court adopted the Board's finding of a threat of economic reprisal since its decision was a reasonable and permissible one though such a statement may be at times either a "permissible forceful argument in support of management's opposition to the advent of a union" or "an illegal threat to the employees in the event the union should win the election"); N.L.R.B. v. Marsh Supermarkets, Inc., 327 F.2d 109, 111 (7th Cir. 1963) (statements were threats of economic reprisal because "the Board could have reasonably inferred that the 'listener-employees' took the statements as threats of loss of benefits and of economic reprisal"); Hendrix Manufacturing Company v. N.L.R.B., 321 F.2d 100, 105 (5th Cir. 1963) (see text); TRW, Inc., 173 NLRB 1425, 1426 (1968) (statement to bargain from minimum wage was held to closely parallel an offer to bargain from scratch, but there was not a threat of economic reprisal since there was no background of threatening employer conduct); Nutrena Mills, 172 NLRB 183, 185–87 (1968) (statements were held not to be a threat of economic reprisal under their "actual setting and surrounding facts"); Howell Refining Company, 163 NLRB 18, 19, 23 (1967) (trial examiner found that, although the statements were isolated in impact, a remedial order was necessary; the Board reversed, holding that the total context did not justify a remedial order); Dal-Tex Optical Company, 137 NLRB 1782 (1962) (statements were held to be threats of economic reprisal in light of other numerous threats and unfair labor practices); Universal Producing Company, 123 NLRB 548, 549–50 (1959) (Board viewed the statement "in context" and held that they did not "constitute an unlawful threat to discontinue existing benefits prior to negotiations").

competition. Our aim is to make the Winneconne plant a stable operation with good, steady employment, and this goal we would not jeopardize.

The Board held that "[t]here is no specific implication that Respondent intended to adopt a bargaining posture offering the employees less than they were receiving." The Board also noted that there were no other alleged unfair labor practices and finally held that "in this context" the statements in the letter were not threats of economic reprisal.

In N.L.R.B. v. Louisiana Manufacturing Company, 374 F.2d 696, 701–703 (8th Cir. 1967), this court was faced with the question of whether similar statements could be construed as being threats of economic reprisal.[5] We there held that "[t]he question to be answered is whether under the circumstances the employees could reasonably conclude that the employer was threatening them with economic reprisals." N.L.R.B. v. Louisiana Manuafacturing Company, *supra* at 702.

The testimony here provides a close question of analysis. No one exactly remembered the words of the question itself. Hauser's statement concerning bargaining from scratch was in response to a specific employee question, in contrast to a planned, unsolicited statement to employees. Besides one other instance of an alleged threat of job reprisal, the General Counsel does not argue on appeal that any accompanying unfair labor practices occurred. Also, Hauser's response is not a clear threat to stop benefits, but is capable of varying interpretation.

■ In general, *express* threats to bargain from scratch and withdraw benefits during negotiations can carry in themselves "their own seeds of coercive threats." Hendrix Manufacturing Company v. N.L.R.B., 321 F.2d 100, 105 (5th

Cir. 1963). It would appear that an unequivocal statement fully supported by the record that benefits would be terminated during negotiations and that the employer would thereafter bargain from scratch would *per se* violate the Act—as that conduct, if carried to fruition, would amount to unilaterally changing existing working conditions. However, the record is far from *explicitly* clear in this case concerning the question by the employee and the response by Hauser. When the statement itself is ambiguous or where the record shows conflicting accounts of what was actually said, it is necessary to determine "whether under these circumstances the employees could reasonably conclude that the employer was threatening them with economic reprisals." N.L.R.B. v. Louisiana Manufacturing Company, *supra* at 702; *accord*, N.L.R.B. v. Marsh Supermarkets, Inc., 327 F.2d 109, 111 (7th Cir. 1963). Those circumstances include, but are not limited to, the nature of the words of the statement itself, whether the statement was elicited by employees, whether accompanying unfair labor practices occurred before the election, and whether the record indicates an anti-union animus in general.

■ In this case, the record does not indicate that the words of the statement in themselves were explicit enough to say that there was a threat of economic reprisal *per se*. Further, no accompanying unfair labor practices occurred; nor do we find an anti-union animus by the Company. Nevertheless, six employees did testify that they thought they would lose benefits and negotiate from scratch. We do note that the record is not unambiguously clear that employees thought that benefits would be lost *during* negotiations. The employees stated that benefits would be lost if the Union "came in." It is unclear to us whether this

5. The statements in *Louisiana Manufacturing Company* did not include "bargaining from scratch", but were statements in part that if the union came in the employees would starve to death, that a loss of overtime would result, and that the Company might have to close. We think the standard of review and legal test in that case can equally be applied in this case regarding a "bargaining from scratch" statement.

means that benefits would be lost at the time the Union "came in" to negotiate or that benefits could be lost due to bargaining from scratch after a collective bargaining agreement was reached. However, we conclude that the Board's finding that the statement was a threat of economic reprisal in violation of § 8(a)(1) was "a reasonable one, which it was permissible for the Board to make . . . [and] its conclusion will not be set aside on review, even though a different inference or conclusion may seem more plausible and reasonable to us." Surprenant Manufacturing Company v. N.L.R.B., 341 F.2d 756, 760 (6th Cir. 1965), *quoted* in N.L.R.B. v. Louisiana Manufacturing Company, *supra* at 703. We accede to the Board's finding on this close issue.

■ The Board also held that Marvin Sikes, Jr., the branch manager of the Foreman plant, made certain coercive remarks to Eddie Reed, a mechanic trainee, in violation of § 8(a)(1). On June 15, 1972, one of the Company's attorneys met with Reed in preparation for the unfair labor practice hearing involved in this case. On June 17th, Sikes confronted Reed and told him to stop "hot rodding" the Company's trucks. According to Sikes, Reed had been warned about "hot rodding" on several occasions, and Reed had left black streaks on the concrete on June 10th. Also according to Sikes, Sikes had received reports that Reed told a fellow employee, Paul Denny, that Reed "had really fixed the Company up" during the interview with the Company's attorney. During this June 17th confrontation with Reed, Sikes, who admitted being angry at Reed for telling employees that Reed had "literally screwed the Company," told Reed that he was "just lucky to have a job" with the Company and that Reed better "tell the truth" at the hearing because he

(Sikes) would "be out there" and would know whether Reed "was telling the truth." Reed said that Sikes told him that "you'd better watch what you say in the courtroom" and that he better not tell anyone about this conversation with Sikes. Reed neither was discharged, nor did he work any fewer hours.

The testimony of Sikes and Reed conflicts concerning the conversation between the two on June 17th. The Board upheld the administrative law judge's finding that the Company's counsel did give proper assurances that no reprisals would result from any statements given during the interview, but also held that Sikes' conduct cancelled out the assurances given by the Company's counsel. The administrative law judge held that Sikes' remarks to Reed were threats to Reed that if unfavorable testimony to the Company was given by Reed, the Company would not be as tolerant of Reed's hot rodding in the future. The administrative law judge also held that Sikes' statement to Reed was coercive, in violation of § 8(a)(1) because it put Reed under fear of job reprisal for his testimony to be given at a Board hearing. We disagree with that legal conclusion.

First, Sikes did not tell Reed that he would be discharged if he gave unfavorable testimony against the Company at the Board's hearing. Even according to Reed's testimony, Sikes said to Reed that "I'm going to be in that courtroom and I'm going to hear everything you say and you'd better watch what you say."

The General Counsel contends the statements by Sikes were coercive and in violation of § 8(a)(1) of the Act.[6] We do not think that Sikes' statements to Reed can be seen as a coercive threat. It is undisputed that Reed had "hotrodded" the Company's trucks on several oc-

---

6. The General Counsel has not argued that Sikes' conduct violated § 8(a)(4), although he cites N.L.R.B. v. Scrivener, 405 U.S. 117, 119–125, 92 S.Ct. 798, 803, 31 L.Ed.2d 79 (1972), to support his argument that a violation of § 8(a)(1) occurred. The *Scriv-* *ener* court expressly said that it was not deciding the issue of "whether the employer's action is also a violation of § 8(a)(1)," N. L.R.B. v. Scrivener, *supra* at 125, but rather found a violation of § 8(a)(4).

casions and Sikes, of course, could reprimand Reed for this behavior. It is also undisputed that Reed had boasted to other employees that he had "screwed" the Company during his interview with counsel for the Company. Sikes' statements to Reed to tell the truth under the factual circumstances of this case only gave fair warning to Reed of his duty under oath at the hearing and did not constitute a coercive threat. We do not regard Sikes' statements to Reed as either a threat of "possible discharge" or a "warning of possible adverse consequences if [Reed] failed to shade his testimony in favor of the Company at the forthcoming trial." Dollar General Corporation, 189 NLRB 301, 307 (1971). Rather, Sikes' statements were a fair warning to a recalcitrant employee that his duty at the hearing was to tell the truth.

We grant enforcement of the Board's finding that the Company violated § 8(a)(1) by stating that bargaining would be from scratch if the Union came in and deny enforcement of the Board's finding that Sikes' statements to employee Reed were coercive in violation of § 8(a)(1).

WEBSTER, Circuit Judge (concurring in part and dissenting in part).

Judge Gibson has correctly observed that "[t]he record presents a difficult and close question concerning the evaluation of the testimony"; that the testimony "provides a close question of analysis"; and that, in an atmosphere free from accompanying unfair labor practices or anti-union animus, "the record is not unambiguously clear that employees thought that benefits would be lost *during* negotiations." Under such circumstances, it is difficult for me to conclude that the "bargain from scratch" statement was a threat of economic reprisal in violation of § 8(a)(1). There is evidence, however, that six of the employees did interpret it as meaning that benefits would be lost during the period of negotiations. In light of this evidence, I cannot say that the con-

clusion of the Board was unreasonable, and I join with the majority on this close issue.

Applying the same test, however, I cannot find unreasonable the Board's conclusion that the statements of Branch Manager Sikes to Eddie Reed as he prepared for the unfair labor practice hearing were coercive. The coupling of a reference to the "hot rodding" incident some six days earlier with Reed's upcoming testimony and a warning to "watch what you say" could reasonably be deemed a coercive effort to obtain favorable testimony under an implied threat of job reprisal. It is possible that Sikes intended no connection between the two subject matters of his conversation with Reed, but I cannot say that the Board's contrary conclusion was unreasonable. Surprenant Manufacturing Company v. N.L.R.B., 341 F.2d 756 (6th Cir. 1965). I would enforce the Board's order in its entirety.