UNITED STATES DEPARTMENT OF JUSTICE, United States Immigration and Naturalization Service, Petitioner, Cross-Respondent,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent, Cross-Petitioner.

INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS, a Division of the National Association of Government Employees, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

Nos. 82–4312, 82–4317.

United States Court of Appeals, Fifth Circuit.

March 19, 1984.

William Kanter, Civ. Div., U.S. Dept. Justice, Carlene V. McIntyre, William C. Owen, Washington, D.C., for petitioner, cross-respondent.

Gordon P. Ramsey, Boston, Mass., for Intern. Bro. of Police Officers, intervenor.

Steven H. Svartz, Acting Sol., FLRA, William E. Persina, Washington, D.C., for respondent, cross-petitioner.

Mark D. Roth, Asst. Gen. Counsel, AFGE, Washington, D.C., for American Federation of Gov't Employees, intervenor.

Before RUBIN, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In Case No. 82–4312, the petitioner, the United States Immigration and Naturalization Service (INS) seeks review of the decision and order of the Federal Labor Relations Authority (FLRA) which found it to have committed unfair labor practices in violation of sections 7116(a)(1) and (5) of the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101, et seq. (1980). In its order, the FLRA held that the INS had violated its bargaining obligation by failing to maintain, to the maximum extent possible, conditions of employment without change during an election campaign. The FLRA seeks enforcement of its order directing the INS to cease and desist from the alleged unfair labor practices. We decline to grant that enforcement.

In Case No. 82–4317, the petitioner, the International Brotherhood of Police Officers (IBPO) seeks review of the FLRA's decision and order which upheld the election objections of the American Federation of Government Employees, AFL–CIO (AFGE), and set aside the election which the IBPO had won in a national unit of approximately 2,300 Border Patrol agents. We decide we do not have jurisdiction to review the FLRA election order and dismiss the petition.

I.

The FLRA is an independent agency within the Executive Branch whose functions with respect to labor-management relations in the federal government are analogous to those of the National Labor Relations Board in the private sector. See 29 U.S.C. § 151 et seq. (1976). In addition to its responsibility concerning unfair labor practices, the FLRA has responsibility for determining appropriate bargaining units and conducting representation elections. 5 U.S.C. § 7105(a)(2)(A), (B) and (C). The FLRA also has the power to promulgate such rules as are necessary and appropriate for the effective administration of the statute's provisions. 5 U.S.C. § 7105(a)(2)(I).

II.

The nonsupervisory employees of the INS (excluding professionals) are organized in two separate nationwide bargaining units, both represented by the AFGE. One unit, not involved in this case, consists of all INS employees except those assigned to INS Border Patrol sector offices. The other, the National Border Patrol Council, AFGE, represents all INS employees nationwide assigned to INS Border Patrol sector offices. On January 19, 1979, when representatives of the INS and the Border Patrol Council were negotiating a revised master agreement, the IBPO filed a representation petition seeking to unseat the AFGE as the unit's bargaining representative. The INS immediately ceased negotiating with AFGE. Pursuant to an Agreement for a Consent or Directed Election signed by the parties, a nationwide secret ballot election was conducted by mail during the period April 24 to June 1, 1979. IBPO received 779 of the votes cast in the election, while AFGE received 476. Following the election, AFGE filed objections to the election with the Regional Director of the FLRA's Sixth Region who found that a hearing was warranted on those objections. During the pendency of the election petition, AFGE had filed two unfair labor practice charges arising from Laredo, Texas, Case Nos. 6–CA–48 and 6–CA–49,[1] alleging that INS

1. In Case No. 6–CA–49, the Authority found    that the INS's unilateral termination of coffee

had unilaterally changed certain conditions of employment without providing it with timely notice and/or an opportunity to negotiate in violation of 5 U.S.C. § 7116(a)(1) and (5).[2] A third charge, Case No. 63–CA–565, filed by AFGE after the election, was based on INS's unilateral changes during the campaign period in the Northern Region.

Under the parties' Master Agreement (which had expired on September 30, 1978, but was extended until January 29, 1979), the INS and AFGE were permitted to negotiate local supplemental agreements. Pursuant to such local negotiations, on August 18, 1977, local INS and AFGE representatives of the Border Patrol's Laredo sector had signed a memorandum of understanding which provided, in pertinent part that traffic checkpoints would not be reestablished during the hours of darkness or bad weather, nor reestablished during the hours of darkness if "torn down"[3] because of bad weather during the day; that such check points would not be maintained if a "backup unit"[4] was not available; and that agents assigned to conduct "city patrols"[5] would wear civilian attire rather than their uniforms. On March 16, 1979, approximately two months after the Master Agreement had expired, the chief of the Laredo Station office advised the local AFGE president that in fifteen days management intended to keep the checkpoints in operation at night, to reestablish them after dark if they were temporarily taken down during the day because of bad weather, and to assign backup units to checkpoints only as they were available. The local AFGE president was also advised that the dress (uniform or

civilian) to be worn by agents carrying out "city patrols" would be determined by local management as the circumstances demanded. As noted above, after these changes were made, the AFGE filed an unfair labor practice charge, Case No. 6–CA–48, complaining that such unilateral changes violated 5 U.S.C. § 7116(a)(1) and (5).

Distinct and apart from the "Laredo" unfair labor practice charge, is the charge arising from the Northern Region. On May 1, 1979, the Border Patrol's Deputy Commissioner ordered INS's Northern Region to send a number of agents on special detail to Livermore, California, by May 8, 1979. The Deputy Commissioner specifically ordered that the agents use commercial air travel to reach that temporary duty post. When agents asked to use their own private vehicles to drive to Livermore from their duty stations in the Northern Region, they were advised that they must fly commercially. After the agents were denied permission to use their own vehicles to make the Livermore trip, the AFGE filed an unfair labor practice charge, Case No. 63–CA–565, alleging that the denial was a unilateral change in working conditions and in violation of 5 U.S.C. § 7116(a)(1) and (5).

Unfair labor practice complaints were issued by the FLRA in response to the "Laredo" and "Livermore" charges. Because three of the objections which AFGE had filed regarding the conduct of the election were based on the management actions which were also the subject of these complaints, hearings on the complaints were consolidated with the hearing on the objections to the election.

---

breaks for unit employees at the Laredo station without prior notice was a violation of section 7116(a)(1) and (5). The INS does not appeal the Authority's finding.

**2.** Section 7116 reads as follows:
    (a) for the purpose of this chapter, it shall be an unfair labor practice for an agency—
    (1) to interfere with, restrain or coerce any employee in the exercise by the employee of any right under this chapter;

    .     .     .     .     .

    (5) to refuse to consult or negotiate in good faith with a labor organization as provided by this chapter; . . . .

**3.** A checkpoint is "torn down" by picking up the plastic signs and cones from the road, placing them in a van, and leaving the checkpoint site.

**4.** A "backup unit" is an agent in a patrol car.

**5.** A "city patrol" involves agents patrolling public areas, such as restaurants in urban centers, to determine if illegal aliens are present.

After a hearing, an administrative law judge found INS guilty of unfair labor practices in Cases 6–CA–48 (Laredo) and 63–CA–565 (Livermore). In Case No. 6–CA–48, the administrative law judge found that the AFGE local was given reasonable advance notice of the proposed changes to enable it to request and engage in meaningful negotiations prior to the effectuation of the decision. He found, however, that INS had violated section 7116(a)(1) and (5) of the statute because it "did not maintain the previously existing conditions to the maximum extent possible during the election period." In Case No. 63–CA–565, the administrative law judge concluded that there was a "past practice" in the Northern Region of permitting agents to use their personally owned vehicles rather than public transportation on "extended details" and that this decision therefore constituted a unilateral change of a past practice in violation of section 7116(a)(1) and (5). In finding the violation, he relied on the fact that the AFGE was not notified of the decision nor given the opportunity to bargain over its impact and implementation.

Furthermore, the administrative law judge sustained AFGE's related objections to the election, as well as independent objections including the nation-wide implementation of an "assault report form," the INS permitting IBPO to use a management bulletin board at Laredo, Texas, and the pro-IBPO statements by an instructor at the INS Border Patrol Academy.[6]

After considering the INS and IBPO exceptions to the administrative law judge's decision, the FLRA agreed that INS had committed the unfair labor practices charged in the complaint. To remedy the unfair labor practices, the FLRA ordered INS to rescind changes in the working conditions at issue and to post a notice to employees stating that it would not violate AFGE's rights. Concerning the election objections, the FLRA adopted all but one of the administrative law judge's recommen- dations and found that the objectionable conduct had interfered with the employees' freedom of choice in the election. Accordingly, the FLRA set aside the first election and directed that a second election be conducted after INS had complied with the notice-posting requirement.

INS and IBPO appeal.

### III.

In Case No. 6–CA–48, we are called upon to decide whether the FLRA is empowered to prevent management from exercising the rights reserved to it by 5 U.S.C. § 7106 during an employee representation election campaign.

In Case No. 63–CA–565, we must consider whether the relevant statute and regulations permit agencies to establish a controlling "past practice" with regard to the selection of modes of transportation to be used by federal employees in performance of their duties or whether the agency is required to make a case-by-case determination.

Finally, because IBPO challenges the FLRA's election order, we must decide whether the order was reviewable so as to invoke jurisdiction of this court.

### IV.

In contending the FLRA's cease and desist order in 6–CA–48 should not be enforced, INS argues that the statute does not authorize the FLRA to substitute its judgment for that of responsible INS management officials on the matters in question. It claims that such operational decisions represent the type of decision-making authority that Congress intended to reserve to agency managers when it drafted 5 U.S.C. § 7106, entitled "Management Rights." With regard to Case No. 63–CA–565, INS argues that government regulations require it to make mode-of-travel decisions on a case-by-case basis. These regulations, it contends, preclude it from establishing a

---

**6.** Because we hold that we do not have jurisdiction to review the FLRA election order and because none served additionally as a basis for unfair labor practice charges against INS, it is unnecessary for us to treat the merits of these objections.

"past practice" with respect to approving the use of personally owned vehicles for all "extended details" to temporary duty posts outside the INS Northern Region. Hence, there was no established past practice. In the alternative, it contends that the record failed to establish the existence of such a past practice.

On the other hand, the FLRA argues that its rule requiring maintenance of conditions of employment without change during an election campaign is reasonably defensible as a means to insure employees free choice. Because of this rule, it contends that notwithstanding any unilateral management right INS might be able to assert under section 7106, the agency must maintain, under the circumstances of this case, the status quo concerning working conditions until the election is concluded. Furthermore, it is by no means certain, the FLRA tells us, that INS has the unilateral right to take the actions at issue under section 7106 of the statute. With regard to Case No. 63–CA–565, the FLRA contends that the applicable federal travel regulations allow the agency to develop a uniform practice, and the agency did so, with regard to allowance of the use of personally owned vehicles for extended details. It also claims that substantial evidence supports the existence of a past practice concerning employee use of personally owned vehicles. It is therefore argued that the INS violated its bargaining duty by unilaterally changing the practice without first notifying the union to provide it an opportunity to negotiate over the change.

### A. Case No. 6–CA–48

This court will normally defer to an agency's determination "when the administrative practice at stake 'involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are as yet untried and new.'" *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, AFL–CIO,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), quoting *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). *See also Bureau of Alcohol, Tobacco and Firearms v. FLRA,* —— U.S. ——, ——, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). Here Title VII of the Civil Service Reform Act dictates that "[t]he [Federal Labor Relations] Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter." 5 U.S.C. § 7105(a)(1). Thus, we will adhere to the principle that the construction of a statute by those charged with its execution should be followed if it is reasonably defensible. *See National Federation of Federal Employees, Local 1451 v. FLRA,* 652 F.2d 191, 193 (D.C.Cir.1981); *Department of Defense v. FLRA,* 659 F.2d 1140, 1162 n. 121 (D.C.Cir.1981), *cert. denied sub nom. AFGE v. FLRA,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

In this case, the Authority has promulgated a rule that an employing agency, such as INS, may not change existing conditions of employment while a question concerning representation under 5 U.S.C. § 7111 is pending before the Authority, except insofar as a change is consistent with the necessary functioning of that agency. Applied to this case, this rule means, according to the FLRA, that the INS should have refrained from establishing or reestablishing highway checkpoints at night; from failing to assign backup units to checkpoints; and from using uniformed agents to conduct city patrols. To decide whether such an application is appropriate, we consider the FLRA's election rule in the light of the statute's management-right section.

Section 7106 of the statute sets forth certain reserved rights of management:

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and

internal security practices of the agency; and

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from—

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

In passing section 7106, the House-Senate conferees stated expressly:

By inclusion of this [7106(b)(1)] language, however, it is not intended that agencies will discuss general policy questions determining how an agency does its work. It must be construed in light of the paramount right of the public to as effective and efficient a Government as possible. H.Rep. No. 95–969, 95th Cong., 2d Sess. (1978), at 154 (Legis.Hist. at 822), U.S.Code Cong. & Admin.News 1978, pp. 2723, 2888.

Indeed, we are required by the very terms of the Act to interpret its provisions "in a manner consistent with the requirement of an efficient and effective Government."[7] We view this language as a directive of great importance.

In analyzing the management rights set out in section 7106, it can be seen that these rights are to be placed in at least three general categories: first, in 7106(a), subjects which may not be negotiated and to which management's absolute right may not be diminished pursuant to any collective bargaining agreement; second, in 7106(b)(1), subjects which the agency may elect to negotiate or not to negotiate with a labor organization; and third, in 7106(b)(2) and (3), subjects which are negotiable.

Generally, subsection (a) sets out management's rights which are absolute and non-negotiable *but* subject to some expressly limited exceptions carved out of these broad rights in subsection (b). For instance, although management has the absolute and unilateral authority to assign employees, to assign their work, and to direct this work, the agency may, pursuant to the provisions of subsection (b)(1), elect to negotiate on the "numbers, types and grades of employees" or "positions assigned" or "the methods of performing work," and may embody such an agreement reached by the parties in a collective bargaining agreement. If such an agreement were reached, management would have waived its right with respect to such matters for the duration of the collective bargaining agreement. Upon the expiration of the agreement, the

---

7. 5 U.S.C. § 7101(b), in full text reading:
It is the purpose of [the Act] to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government. The provisions of [the Act] should be interpreted in a manner consistent with the requirements of an effective and efficient government.

right of agency to elect reasserts itself and management would be free to exercise unilaterally, and in any lawful manner it chose, such rights as are reflected in (b)(1). The agency may, upon request by the union, be subject, under 7106(b)(3), to negotiating arrangements for employees who were adversely affected by implementing new policies pursuant to its rights under section 7106. Of course, the agency would only be required to negotiate on this subject in good faith. It would not be required to reach an agreement.

■ The decision to establish or reestablish a highway checkpoint at night involves a specific direction, or assignment of work, of employees within the meaning of section 7106(a)(2)(A) and 7106(b)(1).[8] The right "to assign work" necessarily encompasses the right to determine when it will be performed. *See National Treasury Employees Union v. FLRA,* 691 F.2d 553, 562 (D.C.Cir. 1982). The decision as to whether to assign a backup unit to a checkpoint involves a determination of the assignment of work and the number of employees to be assigned to a work project within the meaning of section 7106(b)(1). Finally, the decision as to whether an agent will wear a uniform on a "city patrol" involves a determination of the "means" of performing work within the meaning of section 7106(b)(1).[9] Consequently, the decision of the INS with regard to these practices implicated rights which are reserved to management by section 7106.

The INS waived, for the duration of the contract, its rights concerning these practices when its Laredo management executed the supplemental agreement of August 1977 containing provisions concerning checkpoint and uniform policies. When, however, this supplemental agreement expired along with the Master Agreement in January 1979, the INS had the unilateral right, without notifying or bargaining with the AFGE, to make changes in its practices concerning these matters.

Having determined the rights of management ordinarily to make the decisions in question, we must now decide whether the FLRA can, by regulation, suspend those management rights during the pendency of an election. Congress provided specifically in 5 U.S.C. § 7106 that "nothing in this chapter shall affect the authority of any management official of any agency" to exercise the rights reserved to management by that section. This broad and sweeping statement is modified only by reference to subsection (b) of 7106; subsection (b)(1) makes any diminution of rights thereunder subject to the election of the agency. By using the word "nothing" and the words "at the election of the agency," Congress clearly expressed its intent with regard to management's exercise of the rights which had been reserved to it. The use of such words makes it obvious that Congress did not intend to let the Authority decide whether, in its judgment, it was "necessary" for the INS to establish highway checkpoints at night, or to require uniformed agents to conduct "city patrols" during the pendency of the election. It would be difficult to conceive of better examples of the types of operational decisions which Congress wished to leave to management's discretion than those at issue here. Construing the statute to allow the Authority to promulgate a rule which would bar management from exercising its reserved rights during the pendency of a representation question would hardly lead to an INS which was as effective and efficient as possible. This particular question concerning representation has been pending nearly five years. Traffic checkpoints, an important method of deterring the flow of illegal aliens into this country, could not have been established or reestablished during hours of darkness or when backup units were not

---

**8.** Because this decision involves a broad right under 7106(a)(2)(A) which is limited by the provisions of 7106(b)(1), the agency had the right to elect to negotiate on the subjects. *See* discussion, *supra.*

**9.** In INS's opinion, a uniform is an effective aid when an agent is questioning witnesses. On the other hand, a uniform is counterproductive when an agent is pursuing and/or apprehending illegal aliens.

available. Testimony was offered that these practices had severely limited the Laredo Station's ability to carry out the INS's mission in an effective manner and that the smuggling of aliens had increased significantly as a result of the restrictive policies. Also, the wearing of uniforms on certain occasions and not on others is, depending upon the duty being performed, an effective means of carrying out the functions of the INS.[10]

In conclusion, after the master agreement expired in January 1979, the INS was free to discontinue its checkpoint and uniform policies. Management was free to take this step because the checkpoint and uniform policies concerned section 7106(b)(1) reserved rights which the agency could exercise once the contract, pursuant to which the agency had voluntarily limited its rights, had expired. We conclude, therefore, that the Authority's rule suspending the exercise of these management rights during the pendency of a representation question is prohibited by the statute and thus the rule was improperly applied to the acts of management here in question.[11]

### B. Case No. 63–CA–565

In its decision, the Authority, in interpreting government regulations, held that "decisions as to the appropriate mode of transportation are discretionary on the part of [INS] management" under the law. It then proceeded to find that INS had established a past practice that an employee of the Northern Region who was sent on an extended detail outside the region was allowed the option of using his POV (privately owned vehicle) to travel to the detail. Finding the existence of a past practice, it then concluded that INS had violated section 7116(a)(1) and (5) when it made a unilateral change in this past practice by refusing to allow employees of the Northern Region the option of using their POVs to travel to Livermore, California.

---

**10.** See note 8, *supra.*

**11.** Our decision here should not be read as invalidating the rule. We only decide that its

In order to determine whether an established benefit was withdrawn, it must first be determined whether the INS had the authority under the relevant government regulations to establish the claimed benefit. In deciding that INS had the discretion necessary to establish a practice which would be binding, the Authority relied on its interpretation of 5 U.S.C. § 5733 and paragraph 1–2.2 of the General Service Administration's Federal Travel Regulations which govern management's choice regarding the method of transportation used by federal employees in reaching their assignments. Because the section is part of a subchapter administered by the General Services Administration and the Federal Travel Regulations were promulgated by that government agency, no great deference is due the Authority's interpretation of the section and the regulations. *See Florida National Guard v. Federal Labor Relations Authority,* 699 F.2d 1082 (11th Cir. 1983).

Section 5733 provides that "[t]he travel of [a government] employee *shall* be by the most expeditious means of transportation practicable and *shall* be commensurate with the nature and purpose of the duties of the employee requiring such travel." (Emphasis supplied.)

Pertinent Federal Travel Regulations, which are "governmentwide rules or regulations" within the meaning of 5 U.S.C. § 7117(a)(1) provide:

1–2.2. *Method of Transportation*

\* \* \* \* \* \*

b. *Selecting method of transportation to be used.* Travel on official business *shall* be by the method of transportation which will result in the greatest advantage to the Government, cost and other factors considered. In selecting a particular method of transportation to be used, consideration *shall* be given to energy conservation and to the total cost to the Government, including costs of per diem,

---

application to these facts cannot stand in view of the conflict presented with the statutory provisions of section 7106.

overtime, lost worktime, and actual transportation costs. Additional factors to be considered are the total distance of travel, the number of points visited, and the number of travelers. As cited in 5 U.S.C. 5773, "The travel of an employee shall be by the most expeditious means of transportation practicable and shall be commensurate with the nature and purpose of the duties of the employee requiring such travel."

c. *Presumptions as to most advantageous method of transportation.*

\* \* \* \* \* \*

(3) *Privately owned conveyance. Except as provided in 1–2.2d,* the use of privately owned conveyance shall be authorized *only* when such use is advantageous to the Government. A determination that the use of a privately owned conveyance would be advantageous to the Government shall be preceded by a determination that common carrier transportation or Government-furnished vehicle transportation is not available or would not be advantageous to the Government. To the maximum extent possible, these determinations and the authorization to use a privately owned conveyance shall be made before the performance of travel.

\* \* \* \* \* \*

d. *Permissive use of a privately owned conveyance.* When an employee uses a privately owned conveyance as a matter of personal preference and such use is compatible with the performance of official business, although not determined to be advantageous to the Government under 1–2.2c(3), such use may be authorized, or approved provided that reimbursement is limited in accordance with the provisions of 1–4.3. (Emphasis supplied).

Therefore, in determining how an employee is to travel to a detail assignment, the agency must consider cost as well as other factors such as where the assignment

is, how quickly the employee must get there, overtime costs, lost worktime, and whether the use of a POV is compatible with accomplishing the government's business. A consideration of these factors, combined with the requirement of 5 U.S.C. § 5733 that the means of travel used "shall be commensurate with the nature and purpose of the duties of the employee requiring such travel," obligates the agency to make a case-by-case determination regarding the form of transportation. The statute and regulations contemplate that the agency is to take into consideration all the indicated criteria in each situation.

▮ Because a case-by-case determination must be made in each instance regarding the mode of transportation used by the employee, the INS did not have the broad discretion necessary to establish a uniform or controlling "past practice" of allowing agents of the Northern Region to use their POVs in travelling to extended details outside the region. There being no uniform practice, and hence no "past practice," the agency could not have made a unilateral change and accordingly, no violation of section 7116(a)(1) and (5) could have resulted from that refusal.[12]

## C. Jurisdiction

IBPO argues that this court has jurisdiction under 5 U.S.C. § 7123 to review the FLRA decision and order overturning the results of the representation election and directing a second election. Section 7123 in its relevant portion states:

§ 7123. Judicial review; enforcement

(a) Any person aggrieved by any final order of the Authority other than an order under—.

(1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

(2) section 7112 of this title (involving an appropriate unit determination),

---

**12.** Because of the manner in which we decide this issue, we do not find it necessary to reach the question of whether the determination of

how an employee is to travel to a detail is a management right within section 7106.

may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

Congress did not specifically provide in section 7123(a) for direct review of "election" orders, only "final" orders. The question we must decide, therefore, is whether the election order in this case is a "final order of the Authority" subject to judicial review under section 7123 of the Act.

IBPO contends that it is clear that Congress, by passing section 7123, granted the courts of appeal jurisdiction to hear appeals from all final orders of the Authority except matters arising out of an award by an arbitrator under § 7122 and bargaining unit determinations made under § 7112. According to IBPO, the clear and unambiguous terms of the statute allow for appellate jurisdiction for decisions made, as here, under section 7111.[13]

■ IBPO's contention seems to be based on the maxim "expressio unius est exclusio alterius." The rule of exclusion, however, is only an aid to statutory construction, not a rule of law. The controlling consideration is legislative intent and the maxim can be overcome by strong indicia of contrary congressional intent. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 15, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981); *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States,* 312 F.2d 214 (1st Cir.1963), *aff'd,* 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964).

The legislative history of section 7123 reveals that the House expressly attempted in its version of the section to make the following FLRA orders directly appealable: section 7116 unfair labor practice orders;

section 7122 orders (involving an award by an arbitrator); and section 7112 orders (involving an appropriate bargaining unit determination). The House Report on its bill explained its version of section 7123 as follows:

Section 7123 provides for judicial review of certain final orders of the Authority by the circuit courts of appeal, enforcement of orders of the Authority by the same courts, and injunctive relief in appropriate cases.

Section 7123(a) provides that (1) the final order of the Authority in an unfair labor practice proceeding under section 7116, as added by the bill; (2) the award by an arbitrator (which has been reviewed by the Authority in accordance with section 7122, as added by the bill); or (3) a determination of appropriate unit under section 7112; may upon the filing of an appropriate pleading by an aggrieved party within 60 days from the issuance of the order or award, be reviewed by the appropriate United States court of appeals. Jurisdiction is within the circuit where the aggrieved person resides or transacts business, or, in any case, in the District of Columbia Circuit.

*See,* H.R.Rep. No. 1403, 95th Cong., *reprinted in* Subcomm. on Postal Personnel and Modernization of the Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., *Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978,* at 703. *See also* 124 Cong.Rec. 28,204 (1978).

From this it can be seen that the House version of section 7123 did not propose that section 7111 election decisions be subject to judicial review. On the other hand, the Senate version of the statute was even more restrictive on appealable orders than the House version. It provided for judicial review of the Authority's decisions only as

---

**13.** Section 7111 provides procedures to resolve questions concerning employee representation by labor organizations. These procedures include investigation of representation petitions by the FLRA; supervision and conduct of se-

cret ballot elections; promulgation of rules governing the conduct of such elections; and certification of an exclusive representative where appropriate.

they concerned unfair labor practice orders. S. 2640; *see also* remarks of Senator Stevens *reprinted* at 124 Cong.Rec. 27,590–91 (1978).

In conference, the Senate and House conferees agreed that section 7116 unfair labor practice orders would be appealable, but the House receded and the conferees then expressly excluded section 7112 and section 7122 orders from appeal under sections 7123(a)(1) and (2). H.R.Rep. No. 1717, 95th Cong., 2d Sess. 153 (1978), *reprinted in U.S. Code Cong. & Admin.News* at 2860, 2887 (1978). IBPO suggests that the omission of section 7111 election decisions as an exclusion indicates a tacit agreement that section 7111 orders were intended to be directly appealable. This reasoning does not follow, however, when we consider that section 7111 election decisions had never been mentioned as directly appealable orders in either the House or Senate bills. It was only natural that the conferees wanted to clarify matters by expressly providing that section 7112 and 7122 orders were not, as earlier versions of the House bill had indicated, to be directly appealable. In such circumstances, the conferees' action cannot be said to be indicative of an intention to regard a section 7111 election decision as a directly appealable order.

Furthermore, when we examine the legislative history of the statute, we find strong indicia of an intent on the part of Congress to exclude section 7111 election decisions from direct appellate review.

In a conference report on the statute, Congress made it clear that the provisions of the statute concerning the role of the Authority, the proceedings in representation cases and the right of court review were based on established practices of the National Labor Relations Board in the "private sector." H.R.Rep. No. 1717, 95th Cong., 2d Sess. 153 (1978) *reprinted* in (1978) U.S.Code Cong. & Admin.News 2860,

2887. Furthermore, in speaking before the House of Representatives concerning the Act, Congressman William Ford, one of the co-sponsors of the House bill upon which Title VII is based, stated that "judicial review of the authority's decision [was to be] similar to that provided under the National Labor Relations Act...." 124 Cong.Rec. H8468, (daily ed. Aug. 11, 1978). In view of the clearly expressed intent of Congress to pattern the Authority after the National Labor Relations Board, and provide for judicial review similar to that provided by the National Labor Relations Act, it is instructive to consider precedent developed under the National Labor Relations Act.

In the almost fifty years since the passage of the National Labor Relations Act, appellate courts, when asked to review orders of the National Labor Relations Board ("Board") which set aside elections and directed another election, have said many times that such an order is not a "final" order. *NLRB v. Saunders Leasing System, Inc.,* 497 F.2d 453 (8th Cir.1974); *Morse Instrument Co. v. NLRB,* 388 F.2d 1 (6th Cir.1967); *Lawrence Typographical Union v. McCulloch,* 349 F.2d 704 (D.C.Cir.1965); *NLRB v. Moore Dry Kiln Co.,* 320 F.2d 30 (5th Cir.1963). The courts have also said that any type of order by the Board during the representation proceedings, which include the determination of an appropriate bargaining unit, the direction of election, ruling on possible election objections, the certification of a bargaining representative, is not a "final" order. *NLRB v. Saint Francis College,* 562 F.2d 246 (3d Cir.1977); *Bishop v. NLRB,* 502 F.2d 1024 (5th Cir. 1974); *Smith Steel Workers v. A.O. Smith Corp.,* 420 F.2d 1 (7th Cir.1969); *Laundry Workers International Union v. NLRB,* 197 F.2d 701 (5th Cir.1952); *Lincourt v. NLRB,* 170 F.2d 306 (1st Cir.1948). *See also* R. Gorman *Basic Text on Labor Law* 49 (1976).[14] One court referred to orders and

---

**14.** Professor Gorman writes as follows at page 49:

> Board decisions in representation cases, both before and after the holding of the election, are (absent unusual circumstances) not

directly reviewable by the court. *AFL v. NLRB,* (U.S.1940). This includes determination of the Board's jurisdiction, the appropriate bargaining unit, the eligibility of voters, the validity of the election and the certifica-

decisions of the Board, concerning the conduct of an election and certification of an appropriate bargaining unit, as "interlocutory." *NLRB v. Ideal Laundry and Dry Cleaning Co.,* 330 F.2d 712 (10th Cir.1964).[15] In view of this background, Congress's failure in section 7123(a) to exclude by specific words section 7111 election decisions from direct review can hardly be indicative of an intention to cause such orders to be directly reviewable.

On the other hand, we can assume that Congress, in passing the Act, was well aware of the fact that the courts as well as practitioners in labor relations had come consistently to refer to Board decisions and orders in representation proceedings as "non-final" orders which were not directly reviewable. In labelling those orders which are directly reviewable, Congress used the term "final order." It also intended review to be similar to that provided by the National Labor Relations Act. Therefore, its failure specifically to make such orders directly reviewable is strongly indicative of an intention not to do so.

■ In conclusion, a review of the legislative history of section 7123 and the well established practice in dealing with Board orders in representation proceedings, convinces us that judicial review of a decision was never contemplated or proposed by either the House or the Senate as a directly appealable order. Therefore, Congress's failure to specifically designate section 7111 decisions as an exception to final orders does not mean that Congress intended these decisions to be directly appealable. Instead, its explicit statement in a conference report on the statute that private-sector practice be followed in federal-sector labor relations, and the longstanding treatment of election decisions as nonappealable orders, indicate that Congress intended that the preclusion

of direct review of election decisions in the private sector should be followed in the federal sector.

■ Apart from what we perceive as Congress's intention to treat the Authority's decisions in representation proceedings as "non-final" orders, which were not reviewable, we do not believe that the FLRA's order in the representation proceeding which set aside the first election and directed a second election, is a "final" order. In determining whether an order of an administrative agency is sufficiently final for purposes of judicial review, courts have considered the touchstone of finality to be the imposition of an obligation, the denial of a right, or the fixing of a legal relationship. *See C & S Air Lines v. Waterman Corp.,* 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.Ed. 568 (1948); *Ecee, Inc. v. Federal Power Commission,* 526 F.2d 1270 (5th Cir.), *cert. denied,* 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976). There is a reluctance on the part of courts to interfere with administrative rulings until administrative agencies have finished their work.

With regard to the particular order here, it is especially clear that it is not final. The Authority's order setting aside the first election and directing a second election does not have any conclusive legal consequences nor does it finally determine any rights or obligations. It does not purport to determine at all, much less with finality, whether either union will represent the employees in the subject bargaining unit. That matter is left to a second election and subsequent certification proceedings. At the same time, the order does not impose obligations on the Border Patrol or any of the unions. Further proceedings are required before the Authority can issue orders which have conclusive legal consequences. Therefore, the Authority's order here is most assuredly not a "final" order.

tion of the results. These can be judicially reviewed only as an incident to review of a "final order" of the Board in an unfair labor practice proceeding.

**15.** Such decisions and orders can only be indirectly reviewed after a labor organization has been certified by the Board as the employee's exclusive representative and the employer has

been ordered to bargain with the labor organization as the result of the certification; and then only if the employer "tests" the certification by committing an unfair labor practice by refusing to bargain. *AFL v. NLRB,* 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

For the foregoing reasons, this court does not have jurisdiction, in the posture of this case, to review the Authority's decision which overturned the results of the election and directed a second election.[16] IBPO's petition for review in Case No. 82–4312 is therefore dismissed for lack of jurisdiction.

### V.

In summary, the INS did not commit an unfair labor practice by changing its uniform and traffic checkpoint policies at its Laredo, Texas sector office. Neither did it commit an unfair labor practice when it ordered agents of its Northern Region to use commercial air travel to reach their temporary duty post in Livermore, California. For these reasons, enforcement of the FLRA's order in Case Nos. 6–CA–48 and 63–CA–565 is denied. Finally, not having jurisdiction to review the FLRA's decision setting aside the first election and ordering a second election, we express no opinion as to the correctness of its action.

ENFORCEMENT DENIED in No. 82–4312; PETITION DISMISSED in No. 82–4317.

---

**16.** We do not decide whether we would have jurisdiction to review such an election order if an appropriate case came to us pursuant to an unfair labor practice charge testing the validity of a union's certification by the FLRA.